Larry JENKINS et al.,
Plaintiffs-Appellants,

v.

LOUISIANA STATE BOARD OF
EDUCATION et al.,
Defendants-Appellees,

v.

Elmer Glynn PITRE et al.,
Intervenors-Appellants.

No. 73-2594.

United States Court of Appeals,
Fifth Circuit.

Jan. 20, 1975.

Rehearing and Rehearing En Banc
Denied March 6, 1975.

Robert P. McLeod, Monroe, La., for plaintiffs-appellants.

Hilry Huckaby, III, Shreveport, La., for intervenors-appellants.

William J. Guste, Jr., Atty. Gen., Reginald Coco, Asst. Atty. Gen., Baton Rouge, La., A. Mills McCawley, Sp. Counsel, Dept. of Justice, Shreveport, La., for defendants-appellees.

Before TUTTLE, GEWIN and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This suit involves an appeal by six students from a district court order refusing to enjoin their suspensions from Grambling College, a Louisiana state institution. Appellants instituted the action pursuant to 42 U.S.C.A. §§ 1981–1985 and § 1994, alleging that the defendants—the Louisiana State Board of Education, Louisiana State Board of Education President Nix, Grambling College President Jones, and Grambling College Dean of Students Whittaker—violated their constitutional rights under the First, Fifth and Fourteenth Amendments by suspending them from Grambling College for their alleged participation in certain campus disturbances which occurred in November of 1972. It is not disputed that the disturbances occurred. The dispute is over what, if any, was the participation of these plaintiffs in the prohibited acts and whether their conduct was protected by the First Amendment.

The case was tried on the theory that there were two groups of students who were subject to disciplinary action. One group consisted of those students (including Jenkins, Scott, Acorn and Pitre) who sponsored a protest, to be effectuated by a boycott of classes. Because of their involvement in planning, promoting, encouraging and inciting such

activities, they were held responsible for whatever violation of college regulations occurred thereafter, without reference to their personal participation at the time of the disruptions. The other group (including Aikens and Little) consisted of those students who were personally identified as engaging in a violation of college regulations. There is an overlapping of the two groups. For instance, there is evidence which placed organizers Scott and Acorn at the scene of some of the disturbances.

The district court initially found that the students had not been afforded procedural due process by the College Disciplinary Hearing Board and ordered new hearings. The court granted a temporary restraining order pending such hearing and later stayed the suspensions pending appeal to the Louisiana State Board of Education.

 The case was then tried for approximately one full week in an adversary manner before the Hearing Board. All parties were represented by excellent counsel who fully exercised rights of confrontation, cross-examination, and the presentation of witnesses. Of the students disciplined, six appeal, Scott, Jenkins, Acorn, Pitre, Little and Aikens.[1] The parties agree that the district court's denial of a preliminary injunction was for all practical purposes a denial of a permanent injunction and that the record is fully developed. We, therefore, review as if from a final judgment, and we are bound by the clearly erroneous test of F.R.Civ.P. 52(a). The case was decided by the district court judge without a jury upon an administrative record which is only documentary evidence. Thus, the appellants' burden of showing that the trial court's findings of fact are clearly erroneous is not as heavy as it would be if the case had turned on the credibility of witnesses appearing before the trial judge. Sicula Oceanica v. Wilmar Marine Engineering & Sales Corp., 413 F.2d 1332, 1333 (5th Cir. 1969). We should not, however, overturn the decision of the trial court unless we are left

with the definite and firm conviction that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Volkswagen of America, Inc. v. Jahre, 472 F.2d 557, 559 (5th Cir. 1973). After a full review of the record, we affirm the judgment of the district court denying injunctive and supplemental relief, except as it is applicable to Little.

## I. *The Factual Background*

### A. *Prelude to the Disturbances*

During the course of the 1972-73 school year certain grievances and complaints arose among the students at Grambling and other Louisiana colleges. In late October 1972, appellants Scott and Jenkins traveled to the Southern University campus in Baton Rouge and announced their support of a student protest there. Upon their return to Grambling they discussed with fellow students what had occurred at Southern and, assisted by appellant Acorn, spread the word that the first public meeting for a boycott of classes at Grambling would be held at 9:00 a. m. on November 1, 1972. The three tried to rally support for the boycott by addressing students at a Halloween Party in the Student Union Building and by chanting "organize" and "unite" in the women's dormitory area.

At 9:00 a. m. on November 1, a large group of students assembled in the college auditorium to discuss their complaints against the Grambling administration. Scott, the president of the student body, introduced various speakers, including Jenkins and Acorn, who urged the students to boycott classes as a means of expressing their grievances. Appellant Pitre was in attendance at this meeting but there is a conflict in evidence as to whether he was on stage or in the audience. No kind of violent activity was discussed at this meeting.

At approximately 10:00 a. m. a group of 150 to 200 students walked the few blocks from the auditorium to the administration building, where a list of grievances was presented to Grambling

1. There were originally thirteen plaintiffs in this case. The cases of seven of the original plaintiffs—Campbell, Brown, Thibodeaux, K.
James, J. James, Pettigrew and Green—were not appealed.

President Jones. The students came to the administration building en masse, briefly impeded access to the building, but upon request opened up a pathway to provide ingress and egress. President Jones asked some of the students to come to his conference room to discuss the matter with him. He informed them that he would have to call a meeting of his administration prior to giving any concrete response to the grievances listed in the document presented to him. While this meeting was in progress, Acorn instructed other students to come inside the administration building, which crowded the halls and the President's office momentarily, but again, upon request the students departed the building and waited outside. The students meeting with President Jones agreed to return later in the day to receive his response to the grievances. Except for the temporary occupation of the space in front of the administration building and the momentary overcrowding inside, all activity at the administration building was nonviolent and without incident.

Around 2:00 p. m. Scott and Acorn, among other students, met with President Jones to receive his response to the grievances. The administration witnesses complained that both students acted "impatient" with the progress of the meeting and left before its completion. The students admitted leaving early, but justified their departure on their having to report back to the remainder of the students who were in the auditorium for a meeting previously called for 3:00 p. m.

At the 3:00 p. m. meeting Acorn informed the other students what response had been given by the administration to the grievances. She stated her dissatisfaction with the meeting and the administration's sincerity. At this meeting Dean Whittaker tried to speak and present the administration's position but was heckled by the students, despite Acorn's advice to "Let the dean speak."

One additional meeting was held in the auditorium at 10:00 p. m. on the evening of November 1. At this meeting there was a discussion and debate as to whether it would be proper to try to stop the buses which were scheduled to leave early the next morning to carry the Grambling football team and band to Dallas to catch a flight to Hawaii for a football game. Pitre actively participated in this meeting by serving as a moderator of the debate.

Later that evening, Scott and one or two other students went to President Jones' home to request that he not leave for Hawaii the next day. Several administration officials and these students discussed the Grambling situation with the President from approximately 11:00 p. m. to 2:00 a. m. The students committed themselves to take all action they possibly could to prevent any disturbance, specifically to prevent any interference with the buses. President Jones intimated that as long as there was no disturbance or violence, he felt sure it could be worked out so that boycotting students would not be penalized for missing classes. The meeting ended amiably, after which Scott spent a substantial amount of time and effort in going from dorm to dorm trying to pass the word to all students to make certain that no interference with the buses or disturbance resulted. He was successful and no interference or disturbance did in fact result. After being assured by his administrative staff that no danger of violence existed, President Jones departed for Hawaii later that morning.

Thus, the entire day of November 1, 1972, consisted of three student assemblies and a series of meetings with the administration to discuss the grievances. Scott, Jenkins and Acorn had exposed themselves as leaders of the boycott, and Pitre had, at least, actively participated in the day's activities. There was no testimony regarding Little or Aikens' activities on November 1.

B. *The Day of the Disturbances*

The next day, November 2, 1972, the class boycott continued. No student assembly meetings were held, although around 3:00 to 4:30 p. m. a number of students, including Scott, Jenkins and Acorn, gathered in the square near the

administration building. It was shortly after this that the disturbances and violence began on campus. Around 5:00 p. m. tables were overturned in the campus cafeteria. The evidence is in conflict as to whether Scott led a group of chanting students through the cafeteria while the disturbances were taking place or prior thereto. In any event, Scott was identified as standing a few feet from one overturned table and was heard saying "Don't loot the cafeteria." No other appellant was seen in the cafeteria.

Later that evening approximately 200 students, led by Campbell and Thibodeaux (both original plaintiffs who have not appealed their dismissals), assembled in front of the administration building and proceeded to the women's dormitories, where students hurled bricks, stones, and bottles at the dorms. Upon returning to the area of the administration building, campus security officers attempted to disperse the crowd by asking them to leave and clear the area. The crowd refused to obey the request and was given a warning that the officers would sprinkle tear gas in the area if it did not disperse within five minutes. After this period of time the security officers carried through with their ultimatum and proceeded to sprinkle tear gas in the midst of the crowd. This moved the group back from the administration building toward the middle of the square around the flag pole. A large number of the students left the area, but approximately 75 to 100 students remained around the flag pole.

Around 11:00 p. m. a Volkswagon was overturned in front of the administration building and stripped of its hubcaps. At this time the officers proceeded to fire shots over the heads of the students in order to disperse them. Most of the crowd did move out of the area. Those who did not leave, or who came back into the area after the firing stopped, were caught in a dragnet of police and campus security officers and were arrested.

Jenkins, Scott and Pitre were not in this area at all during the disturbances. Acorn was seen briefly in the vicinity but was not among those caught and arrested on the night of November 2, 1972. Little and Aikens were arrested that evening because they were in the area after the gun shots and tear gas dispersals. Aikens was identified as he left a group of students who had returned after the shots had been fired and walked toward two officers who were stationed between the gym and the administration building. While "crouching behind the base of the flag pole," Little was arrested by a campus security officer after the dragnet was employed.

During the course of these disturbances, Jenkins and Scott made several attempts to restrain and stop other students from engaging in or committing any illegal acts. They approached Dean Whittaker around 8:30 p. m. and requested paper and stencils to run off material calling the boycott to an end. Jenkins also discussed with the security officers the idea of forming a student police force to curtail the disturbance, but could not find any students to participate. By this time, the peaceful boycott had turned into a violent campus disruption.

### C. *Aftermath to the Disturbances*

The plaintiffs-appellants were advised by letter dated November 7, 1972, that they had been suspended from Grambling College until proper arrangements could be made for a hearing as to their activities during the November 2 violence and destruction.[2] A disciplinary hearing was set for November 15–16 and on November 13 plaintiffs received notices stating:

You are to answer to questions pertaining to the following charges that have been brought against you:

1. Inciting to riot.
2. Disturbing the peace.
3. Criminal damage to public property.

---

2. This letter was sent to all appellants except Pitre who was not charged with any disciplinary action until he had appeared as a witness on behalf of a fellow student at the November 15–16 hearing. After he was charged and faced with suspension, he was allowed to intervene in this action.

Upon entering the hearing room on November 15 each student was handed a document entitled "Information for Disciplinary Hearing Board." This paper advised each student that he or she was charged with violating Grambling College regulations "No. 3" and "Conduct of Groups" and Louisiana State Board of Education regulations "Nos. 4 and 8," all of which are set out in the margin.[3] Below the formal statement of charges, this document further elaborated the activities of these students alleged to constitute violations of the regulations. After this hearing all plaintiffs were suspended.

On November 27, 1972, plaintiffs instituted this action to enjoin their suspensions. Finding that the students had not been afforded the requisite procedural due process at the November 15–16 hearing, the district court granted a temporary restraining order and instructed the College Disciplinary Hearing Board to conduct new hearings. The second hearings began on November 30. The same charges were heard and sanctions of suspension were again imposed, although in some instances for a shorter duration.

The district court stayed these suspensions pending appeal to the Louisiana State Board of Education. The TRO was extended through the winter semester, but grades and credits were withheld pending appeal. On January 5, 1973, the district court ordered the State Board to hear the appeal on January 15, the first day of the new semester, and further instructed that Grambling officials would not be required to register the students for the next semester until so ordered by the court or the State Board. The January 5 order was twice modified on motion of defendants, to allow the State Board until January 18, and then until January 20, to hear the appeal and render its decision. The State Board, on the basis of a written transcript of the second hearings and the oral arguments of counsel, affirmed all findings and sanctions of the Disciplinary Board.

On January 30, 1973, the plaintiffs filed a supplemental complaint amending their pending motion for preliminary injunction. The amendment requested that the court not only enjoin the suspensions but command defendants to reinstate the students in good standing,

---

**3.** The Grambling College regulations alleged to have been violated were:

RULES AND REGULATIONS

Any student who is guilty of committing any of the acts listed below must appear before the College Disciplinary Hearing Board, and may be sanctioned up to and including suspension . . .

. . . .

3. Drunkenness and/or disorderly conduct that results in injury to person or property.

CONDUCT OF GROUPS

*Disorderly Assembly*

It is strictly forbidden for any group of students to gather in such a manner as to disturb the public peace, do violence to any person or property, disrupt the function of the college or interfere with its faculty or staff in the performance of their duties, or otherwise by such gatherings bring disgrace or disrepute to the college. Any student who encourages, or in any way participates in the formation or prolonging of such a gathering, who loiters in the vicinity of such a gathering, is subject to an immediate dismissal from the college.

*Disturbing the Peace and Destruction of Property*

Organization or group of students who destroys, molests, defaces, or removes state or college property under the guise of initiation, pledging, or any purpose, the student officers of the organizations, if there be such or other responsible person, will be brought before the college disciplinary committee for disciplinary action and will be charged with the damages and abuse of said property.

The Louisiana State Board of Education regulations alleged to have been violated were:

Disciplinary procedures . . . shall apply to any person who commits or attempts to commit any of the following acts of misconduct.

. . . . .

4. Theft or damage to property to the university/college or a person on the campus.

. . . . .

8. Aid or inciting others to commit any act of misconduct set forth above.

assist them in making up the time lost during the 1973 spring semester, grant credit for the winter semester completed under the TRO and expunge from their school records any mention of these disciplinary charges, hearings, and suspensions. The amended complaint also sought money damages for the mental humiliation, income loss and attorney's fees incurred by the plaintiffs. On May 15, 1973, based upon the record before the Disciplinary Board and State Board of Education, the district court issued a written opinion denying the motion for preliminary injunction and supplemental relief. There were no de novo hearings either by the State Board or the district court.

## II. The Case Against the Organizers (Jenkins, Scott, Acorn and Pitre)

### A. Sufficiency of Notice of Conspiracy Charge

Both in their brief and at oral argument appellants Jenkins, Scott, Acorn and Pitre relied heavily upon the contention that the Disciplinary Board's procedures did not comply with minimum procedural due process because the students lacked notice of any conspiracy charge. They point out that the college's entire case depends upon its ability to tie them into a conspiracy, since otherwise they are not shown by any of the facts found by the Disciplinary Board to have committed any prohibited acts. They conclude that since the charges on which they were tried did not allege the existence of a conspiracy, they were thus tried and disciplined upon charges that were not even made against them. In this fashion they seek to cut their own actions away from the conduct of others who acted in concert with them and who were found guilty and did not appeal (e. g., Thibodeaux and Campbell).

In considering this argument we will assume, without deciding, that there was no supportable finding of solely individual violations, unconnected with group activity, by any of these four students. This leads us to the intermediate position advocated by appellants—that the col-

lege's case against them depends upon its ability to tie them into a conspiracy. We do not agree, however, with appellants' conclusion that they lacked notice of a conspiracy charge. Since we believe that sufficient notice of a conspiracy charge was given, any finding by the Disciplinary Board of a conspiracy was proper and in compliance with due process standards.

The classic starting point for an inquiry into the rights of students at state educational institutions of higher learning is Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), a case in which students were disciplined without being provided any notice or opportunity for hearing. It was in this context that Judge Rives said that

. . . due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct. . . The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education.

294 F.2d at 158. The Court was very much aware of the distinction between any notice and sufficient notice:

The evidence clearly shows that the question for decision does not concern the sufficiency of the notice or the adequacy of the hearing, but is whether the students had a right to any notice or hearing whatever before being expelled.

294 F.2d at 154. Commenting on this case in his article The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1072 (1969), Professor Charles A. Wright stated that "no court since Dixon has denied that the student must be given prior notice of the grounds on which the charge is based." In this case we do not depart from these precedents, since the question for our decision concerns sufficiency of notice rather than the question in Dixon of whether notice need be given at all.

■ We realize that the oft-quoted dictum in *Dixon* says that the notice should contain a statement of "specific charges and grounds" and that a "student cannot be punished on the basis of some ground other than that stated in the written charge." 22 Vand.L.Rev. 1027, 1072 (1969), *citing* Hammond v. South Carolina State College, 272 F.Supp. 947, 950 (D.S.C.1967) and Woody v. Burns, 188 So.2d 56, 57 (Fla.App.1966). Judge Rives also recognized, however, that "[t]he minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interest of the parties involved." 294 F.2d at 155. The standards of procedural due process are not absolutes. Due process in the context of this case is not to be equated with that essential to a criminal trial and the notice of charges need not be drawn with the precision of a criminal indictment. *See* Linwood v. Board of Education, 463 F.2d 763 (7th Cir.), cert. denied, 409 U.S. 1027, 93 S.Ct. 475, 34 L.Ed.2d 320 (1972).

■ College administrators should not be held to the strict requirements of criminal law relating to giving notice of conspiracy. Although here the notice given to appellants could undoubtedly have been drafted with more precision, the charges do include numerous allegations of group or concerted actions. The document entitled "Information of Disciplinary Hearing Board" clearly sets forth the type of conduct included in the Board's finding of conspiracy.[4] Appellants were referred to as "organizers," "leaders," and "instigators." The November 7 letter advised the students that they were charged with the violation of "inciting to riot." Again it is important to note the distinction between a college disciplinary proceeding and a criminal trial. The judicial gloss given to the word "conspiracy" in the field of criminal law should not carry into another area where laymen operate in an altogether different context. The charges, the hearing, and the findings all evidence the fact that the "conspiracy" here involved was the group activity, and the individual participation in that group action. There is no doubt in our minds that the notice given to appellants was in sufficient detail to fairly enable them to present a defense at the Disciplinary Board hearing.

A reading of the record clearly reveals that appellants understood the nature of the charges against them. Their counsel was quite prepared to refute those charges at the hearing and conducted ardent cross-examination of the college's witnesses. Assuming the written charges were deficient, the appellants had more than two weeks between their November 15–16 hearing and the later hearing ordered by the district court in which to prepare a defense to the charge of conspiracy. Under the particular cir-

4. For example, the "Information for Disciplinary Hearing Board" regarding appellant Jenkins contained the following elaboration:

Larry Jenkins was arrested in connection with a disturbance which resulted in destruction of property. He was *one of the leaders* of the protest that erupted into a disturbance which brought disorderly conduct and simple criminal damage to public and private property on November 2, 1972. The disruption began around 5:00 p. m., when *members of the group* disrupted the evening meal in the college dining hall, causing damage to the facility. *The group* also caused damage to the student union building, and *group members* committed simple arson on the president's house. *The group* of about 100 to 150 students failed to obey several orders given by the chief of campus security officer to disperse, includ-

ing the sprinkling of tear gas *among the group.*

Earlier in the evening, *the group* blocked the state highway passing through the campus (simple obstruction of a highway of commerce) for approximately four hours, then made an approach to the Administration Building. After several speeches and shouts of obscenities, *the group* left and marched through the women's residence area and did considerable damage to residence halls. *The group* later returned to the Administration Building and continued to disobey orders to disperse, until a number of arrests were made.

Mr. Jenkins made one speech in the auditorium in connection with the protest and served as *one of the organizers.* (emphasis added).

The charges against the other appellants were similar.

cumstances of this case, we believe that appellants had sufficient notice of the specific charges and grounds (*i. e.*, conspiracy) developed at the Disciplinary Board hearing to support their suspensions.

B. *The Conspiracy Finding*

█ In its "Finding of Facts" the Disciplinary Hearing Board only made reference to the existence of a conspiracy in its statement as to Jenkins:

A conspiracy existed between Larry Jenkins, Louis C. Scott, Jo Ann Acorn, Elmer Glenn Pitre, Larry Campbell, Ernest Brown and others to disturb the peace and cause disruptive actions at the college.

Appellants argue that this means we should review the sufficiency of the evidence against the other individuals based upon their own separate findings of facts and absent the conspiracy finding.

We disagree. The "Finding of Facts" was contained in a single document addressed to the attorneys for the students and for the college and contained statements as to all six appellants, plus findings as to those original plaintiffs who did not appeal. It seems clear that the Board meant for the findings of conspiracy between Jenkins, Scott, Acorn, Pitre and others to apply to each of these named individuals. We do not think it unreasonable to incorporate these findings in the statements of facts as to each of those students mentioned as being a member of the group.

█ The evidence clearly shows that, at least as to Jenkins, Scott and Acorn, these "leaders," "organizers," and "instigators" of the boycott did provoke group action which led to violence. They did so not only by the simple expedient of making speeches urging a boycott, but by actively going about the campus in an effort to gain support for the protest. They stimulated many members of the student body to an emotional state which erupted into the serious and destructive violence of the evening of November 2, 1972. The record in this case demonstrates that these three students, from time to time and in varying degrees, had a strong power and influence over the conduct of their fellow students. The mere use of the descriptive term "peaceful boycott" cannot, under the circumstances of this case, be used to immunize and shield what was actually done.

█ The case against Pitre is not as strong as that against the other three organizers. Nevertheless, the record supports the Board's finding that he was a part of the group as an active participant in the series of meetings which led to the disruptions.

III. *The Case Against the Active Participants (Aikens and Little)*

Aikens and Little were apprehended during the course of the riots on the night of November 2, 1972, after being caught in the dragnet of police officers which closed in on the group of students who had returned to the square in front of the administration building after tear gas shots had been fired to disperse the group. Aikens was identified as he left this group of students and approached two deputy sheriffs who were part of the dragnet. We have no difficulty in concluding that Aikens violated the Grambling College regulations as to "disorderly assembly," see note 3 *supra*, and therefore was properly suspended.

█ The record and, more particularly, the Board's findings of fact show that Aikens "loitered" in the vicinity of the gathering which, without question, disturbed the public peace and caused damage to property. He had no explanation for his presence at the scene of the disturbances and did not testify in any manner to contradict the testimony of the officers who saw him actually leaving the group of students who remained present after the order of dispersal. In the absence of any testimony to the effect that he had come on the scene only after all of these occurrences, it is clear that the Board's suspension must be upheld.

█ There is, however, *no* evidence to support a finding that Little was "loitering" after the command to disperse. The Board found only that "Mr. Little

was arrested by a Campus Security Officer [while] crouching behind the base of the flag pole." The testimony of the Campus Security Officer is that he saw Little fifteen or twenty minutes after the firing of the shots and after the time when the final group of students had dispersed. This fully coincides with Little's testimony that he did not leave home until he heard the shots, at which time he came across the campus and was on his way to the village when he was arrested by the Campus Security Officer. To the extent that there is a dispute in testimony, we must, of course, credit the testimony which was credited by the Board. Looking at the evidence most favorable to the Board's finding, there is no evidence to establish that Little had any knowledge of the orders to disperse or had in any way refused to obey them or had stayed on and thus become a "loiterer" in relation to the crowd that had done the damage to the property. For these reasons, the suspension of Little cannot be upheld.

## IV. *First Amendment Rights*

■ Although we have found evidence to support the Board's finding that these students, except Little, did violate the college regulations as charged, we must still consider whether the college's action in suspending appellants violated their First Amendment rights. As was recognized in Tinker v. Des Moines, etc., School District, 393 U.S. 503, 506–507, 89 S.Ct. 733, 736–737, 21 L.Ed.2d 731 (1969):

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. . . . On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.

Although students certainly have the right to assemble peaceably and to urge a peaceful boycott, it is clear that their right to do so is not unbridled. Their First Amendment rights are not unlimited constitutional guarantees which may be exercised at any time, at any place, and in any circumstance. This case presents the frequently recurring conflict between student exercise of First Amendment rights and legitimate rules of school authorities.

■ The controlling rule to be applied was first set forth in this Circuit's case of Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966), and was later expounded upon by the Supreme Court in *Tinker.* A student may exercise his First Amendment rights

. . . . if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. Burnside v. Byars, *supra,* 363 F.2d at 749. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. *Cf.* Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (C.A. 5th Cir. 1966).

Tinker v. Des Moines, etc., School District, *supra,* 393 U.S. at 513, 89 S.Ct. at 740.

The *Burnside* and *Blackwell* cases referred to in *Tinker* were decided by this Court in 1966. Principals of two Mississippi high schools had announced that their students could not wear "freedom buttons" to school to show their support of civil rights. At each school some of the students continued to wear the buttons and were suspended. The same panel of this Court decided both cases. Speaking through Judge Gewin, this Court ordered the students reinstated at one of the schools but allowed the suspensions at the second school to stand.

In the *Burnside* case the Court found the regulation against "freedom buttons" arbitrary and unreasonable in the absence of any showing that the wearing of the buttons had interfered with educational activity, or caused a commotion or distracted the other students. But in *Blackwell,* the record shows that students wearing the buttons had created "a state of confusion, a disruption of class instruction and a general breakdown of orderly discipline." Blackwell v. Issaquena County Board of Education, *supra*, 363 F.2d at 751 n. 2. The different effect of the challenged student conduct on each school's environment accounted for the dichotomous result in the two cases.

The case *sub judice* is more akin to *Blackwell* than it is to either *Burnside* or *Tinker.* It involved material and substantial interference with the requirements of appropriate discipline in the operation of an educational institution. There is ample evidence in the record to demonstrate the disruptive influence on the educational process at Grambling brought about by the consequences of the boycott sponsored by appellants. The actions of appellants in going about the campus shouting and chanting "organize," "unite," and "student power" subjected the teaching and learning atmosphere of the college to disruption, distraction, and destruction. Their actions were far from the "silent, passive expression of opinion, unaccompanied by any disorder or disturbance" found in *Tinker* at 508 of 393 U.S., at page 737 of 89 S.Ct., nor can it be said that in this case "[t]he record indicates only a showing of mild curiosity on the part of other [students]." Burnside v. Byars, *supra*, 363 F.2d at 748. As has been shown, these organizers initially provoked the group action which led to the disorder and the disturbances of the evening of the 2nd of November. The actions of appellants resulted in a material disruption of the campus and of the rights of others. They were not protected by the First Amendment.

## V. *The Impartiality of the Hearing Board*

Appellants claim that the Disciplinary Hearing Board was predisposed against them and was not an impartial trier of facts, thus denying them due process of the law. There is no question but that a student charged with misconduct has a right to an impartial tribunal. This Court, however, has previously declined to establish a *per se* rule that would disqualify members of a hearing body, such as the Disciplinary Hearing Board, solely because they are employees of the college or because they might have participated in an initial investigation of the incident which necessitates the hearing. Duke v. North Texas State University, 469 F.2d 829 (5th Cir. 1972), cert. denied, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973). We realize that the Board at the first hearing in this case made more than an initial investigation, actually imposing suspensions on appellants. We are also aware that the members of the Board were appointed by President Jones, one of the main witnesses against the students.

We are asked to infer that because the Board had already had one hearing and because its members were appointed by the college president (who had also employed many of them), the members must have been partial to the college's position. We have not been shown any evidence of bias or prejudice of the Board members, and our own examination of the record has not uncovered any. "Alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." Duke v. North Texas State University, *supra*, 469 F.2d at 834. We do not believe that, under the facts of this case, these students were denied a fair and impartial hearing.

## VI. *The Constitutionality of the Regulations*

Appellants last challenge their suspensions on the grounds that the

1004

Grambling College and Louisiana State Board of Education regulations they are said to have violated, see note 3 *supra,* are unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments. Although these constitutional doctrines have been applied to regulations of educational institutions, Soglin v. Kauffman, 418 F.2d 163 (7th Cir. 1969), it is clear that school disciplinary regulations need not be drawn with the same precision as are criminal codes. Murray v. West Baton Rouge Parish School Board, 472 F.2d 438 (5th Cir. 1973). We find the *Murray* case controlling:

> [S]ome degree of discretion must, of necessity, be left to . . . school officials to determine what forms of misbehavior should be sanctioned. Absent evidence that the broad wording in the statute is, in fact, being used to infringe on First Amendment rights . . . we must assume that school officials are acting responsibly in applying the broad statutory command.

*Id.* at 442 (footnote and citations omitted). These regulations are codes of general conduct only. College students should have no difficulty in understanding what conduct the regulations allow and what conduct they prohibit. They ask for adherence to standards of conduct which befit a student, enhance the educational purposes of the school, and warn of the danger of mass involvement. *See* Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970).

■ There is no evidence in this case that the Grambling administrative officials or the Disciplinary Hearing Board utilized the regulations to infringe on constitutional rights. We do not find the challenged regulations to be so vague or so overbroad as to evade protected freedoms contrary to the First and Fourteenth Amendments.

## VII. *Conclusion*

Upon review of the rulings by the Disciplinary Hearing Board, the State Board of Education, and the district court, and after full consideration of the transcripts and briefs filed by opposing counsel, we determine that the suspensions of students Jenkins, Scott, Acorn, Aikens and Pitre must stand and that the suspension of Little must be reversed.

The case must be remanded to the trial court for the entry of such order as will hold the suspension of Little to be void and will require such remedial academic action by the college officials as is now available to reinstate him without any remaining record of the suspension and with such credits as his previously suspended grades will permit.

In light of the disposition which we make of the case, the issue of money damages and attorney's fees claimed by the prevailing appellant should initially be determined by the district court, and we express no opinion whatsoever as to the propriety of such claims.

The judgment as to Jenkins, Scott, Acorn, Pitre and Aikens is affirmed, and the judgment as to Little is reversed.

TUTTLE, Circuit Judge (concurring in part and dissenting in part):

With deference to the views of my colleagues, I must dissent from that part of the decision of the Court and the opinion which supports it, dealing with the suspension of the appellants, Jenkins, Acorn, Scott and Pitre. I concur in the judgment of the Court with respect to the appellants, Aikens and Little. I agree that the evidence and the findings against Aikens support the penalty imposed upon him because there was support for the determination that he had violated the specific regulation of Grambling College prohibiting loitering in the vicinity of a gathering which was of such a nature as to "do violence to any person or property, disrupt the function of a college or interfere with its faculty or staff," I also agree that there is no evidence in the record to support the charges against Little. To this extent I concur with the Court's opinion.

I would not dissent from the decision as to the others were it merely a matter

of testing the facts as to each of the suspended students. I do so only because I feel that as to the four appellants mentioned above this Court has held that students who merely made speeches in auditoriums, and out of doors and at places entirely removed from the classrooms, in support of, and who otherwise urged fellow students to join in, a boycott of classes *in a manner which the school officials all conceded was not only done peaceably* but which stressed peaceful conduct,[1] could thereafter be held responsible for the actions of "groups" of students which comprised other individuals who committed acts of vandalism and disruption of the cafeteria. I think such a holding is erroneous not primarily because these students were not charged with a conspiracy, and they may thus have been deprived of procedural due process to defend themselves by showing that there was, in fact, no such conspiracy, but because they were deprived of substantive due process in that they have been found guilty of acts of violence which they neither urged nor condoned, simply because their "pure speech" aroused the emotions of others who later committed illegal acts.

I base the conclusion just stated on the statement in the opinion, when dealing with Sufficiency of Notice of Conspiracy Charge. "In considering this argument we will assume, without deciding, that there was *no supportable finding of solely individual violations,* unconnected with group activity, by any of these four students. This leads us to the intermediate position advocated by appellants—that the college's case against them depends

upon its ability to tie them into a conspiracy. We do not agree, however, with appellants' conclusion that they lacked notice of a conspiracy charge . . . ."

What the majority assumed I find is clearly demanded by the record before us. I find no evidence, upon repeated careful readings of the testimony, that would support a finding that any of these students was guilty of a substantive charge of violating either the school or the board regulations unless it is charge number 1 "inciting to riot," and as to that the *board made no such finding in its findings of fact as to any one of the four.* Moreover, such charge, if found to be true, would, on this record, be supportable only on the theory that, once having made a protest speech, which urged no illegal or disruptive acts, the speaker is punishable for all riotous conduct that followed because of the emotional impact of the speech itself. The constitutional implications of such a finding will be discussed in more detail later.

It is clear that the majority opinion considered that the charges adequately apprised all the students involved that they were charged with being members of a "group" that carried on the destructive acts. The opinion stated "although here the notice given to appellants could undoubtedly have been drafted with more precision, the charges do include numerous allegations of group or concerted actions." The opinion then attaches a copy of the document furnished each student on the day of the preliminary hearing entitled "Information for Disciplinary Hearing Board."[2]

---

1. It is to be noted that in neither the charge against any of these students nor in the findings against them was it made a basis for their suspensions that they had urged or spoken in favor of anything illegal or disruptive. The record shows that the president of the college himself had agreed that any absence from classes could be worked out without any sanctions.

2. For example, the "Information for Disciplinary Hearing Board" regarding appellant Jenkins contained the following elaboration:

 "Larry Jenkins was arrested in connection with a disturbance which resulted in destruc-

tion of property. He was *one of the leaders* of the protest that erupted into a disturbance which brought disorderly conduct and simple criminal damage to public and private property on November 2, 1972. The disruption began around 5:00 p. m., when *members of the group* disrupted the evening meal in the college dining hall, causing damage to the facility. *The group* also caused damage to the student union building, and *group members* committed simple arson on the president's house. *The group* of about 100 to 150 students failed to obey several orders given by the chief of campus security officer to disperse, including the sprinkling of tear gas *among the group.*

The emphasis to certain of the language in the foregoing document was inserted by the majority presumably to indicate the substantial number of occasions when "the group" committed some depradation. The trouble with this approach is that there is not a word of proof in the record that any one of these four appellants with the single exception of Scott[3] *was a member of any one of the groups mentioned in the above notice* while acting destructively.

Thus, I come to the part of the majority opinion which appears to me would establish a rule of law in conflict with the protections of the First Amendment. I refer to the following passage:

"The evidence clearly shows that, at least as to Jenkins, Scott and Acorn, these 'leaders,' 'organizers,' and 'instigators' of the boycott did provoke group action which led to violence. They did so not only by the simple expedient of making speeches urging a boycott, but by actively going about the campus in an effort to gain support for the protest. They stimulated many members of the student body to an emotional state which erupted into the serious and destructive violence of the evening of November 2, 1972. The record in this case demonstrates that these three students, from time to time and in varying degrees, had a strong power and influence over the conduct of their fellow students. The mere use of the descriptive term 'peaceful boycott' cannot, under the

circumstances of this case, be used to immunize and shield what was actually done.

The case against Pitre is not as strong as that against the other three organizers. Nevertheless, the record supports the Board's finding that he was a part of the group as an *active participant in the series of meetings* which *led* to the disruptions." [Emphasis added].

Without stating so in so many words, it seems that the majority has accepted the theory which was espoused by the University officials when they prepared the charges. The following testimony given by Dean Whittaker concerning the conduct of Jenkins is illuminating:

"Q. I presume it is not your contention that Mr. Jenkins participated in any violent activity on the night the violence took place on the college campus?

A. No., I am not saying that he did.

Q. Basically, do you draw up this charge we have?

A. I surmised it based on information I had that he was depicted as a leader or spokesman for the protest.

Q. In other words, would it be correct in stating because he appeared to you by virtue of having made a speech to have advocated the protest and peaceful boycott, then you intended to hold him responsible for the violence which took place and what

---

Earlier in the evening, *the group* blocked the state highway passing through the campus (simple obstruction of a highway of commerce) for approximately four hours, then made an approach to the Administration Building. After several speeches and shouts of obscenities, *the group* left and marched through the women's residence area and did considerable damage to residence halls. *The group* later returned to the Administration Building and continued to disobey orders to disperse, until a number of arrests were made.

Mr. Jenkins made one speech in the auditorium in connection with the protest and served as *one of the organizers*." [Emphasis added.]

3. The only evidence that he was a part of any "group" mentioned in the foregoing charge is that one student testified that he was seen "two seats from a turned-over table," whereas a Mr. Rogers who was Director of Food Services for the college and therefore responsible for the operation of the cafeteria, testified that when he saw Scott he was some forty feet away from any turned-over tables. He further testified that Scott was *not* one of the six or seven persons who were turning over the tables and that he was not even near that group of students. He also testified that he heard Scott say "Don't loot the cafeteria." Thus it is clear that Scott's participation in that particular "group" could not be considered culpable.

you felt was a result of the protest?

A. Yes."

It should be repeated again that there is not a single word of evidence that these "leaders," "organizers," and "instigators" ever spoke a single word urging any student to do more than stay out of class or to attend another meeting to create interest in support of the boycott. We do not have here the case of a speaker urging violence or revolutionary or destructive acts which amount to a crime. Even in such cases, efforts to limit the espousal of such illegal acts are strictly limited by the requirement that there must be an immediate and real threat that such acts will be carried out by the listeners, the so-called "clear and present danger" requirement. *See*, Dennis v. United States, 341 U.S. 494, 503–504, 71 S.Ct. 857, 95 L.Ed. 1137 (1950); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Here, it bears repeating again, there is nothing but innocent language which was subsequently followed by group action in which these appellants did not participate. It must be borne in mind that the language of the opinion that these " 'leaders,' 'organizers,' and 'instigators' of the boycott did provoke group action which led to violence" is not intended to mean that these persons used such language as would reasonably be expected to cause violence or that they themselves urged it. There is no dispute as to these facts.

Further, as to the statement that "these three students, from time to time and at varying degrees, had a strong power and influence over the conduct of their fellow students" seems to me to be unintentionally misleading in that it implies that there is some evidence in the record that these three students attempted to influence the conduct of their fellow students along the lines that were destructive. Again, I point out, there is no evidence to this effect. In fact all of the evidence bearing on this phase of the matter is that not only was the peaceful

nature of the boycott stressed, but on several occasions these persons undertook to exert leadership to prevent potential damage to the institution.

With deference, I must disagree with the conclusion of the majority that a limitation on the right of these four appellants to assemble and speak as they did is justified under the principles announced by the Supreme Court in Tinker v. Des Moines, etc., School District, 393 U.S. 503, 506–507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker* the Supreme Court recognized the distinction between the two cases from our Court, Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966) and Blackwell v. Issaquena Co. Bd. of Ed., 363 F.2d 749 (5th Cir. 1966). As pointed out in the majority opinion in the *Burnside* case the Court found a regulation against the wearing of "freedom buttons" arbitrary and unreasonable in the absence of any showing that the wearing of the buttons had interfered with educational activity, or caused a commotion or distracted the other students, but in *Blackwell,* the record shows that the students wearing the buttons had created "a state of confusion, a disruption of class instruction and a general breakdown of orderly discipline." Blackwell v. Issaquena Co. Bd. of Ed., *supra,* at 751 n. 2.

As I read the Supreme Court's *Tinker* opinion it is evident that when the Court is speaking of the protected rights the Court is directing its attention to the conduct of the individual actor or speaker and not to the conduct of *other persons* who may thereafter have materially and substantially interfered with the school's discipline. As previously pointed out, this record is silent as to any material or substantial interference with the requirements of appropriate discipline and the operation of the school by the "pure speech" of these four appellants.

Moreover, it must be borne in mind that what our Court was dealing with in *Blackwell* was a determination whether a regulation issued by the principal of a school following an experience of "a state of confusion, a disruption of class

instruction and a general breakdown of orderly discipline" was reasonable. The question there was whether a determination by the school principal that the conduct of the pupils wearing the freedom buttons was so closely identified with the wearing of the buttons that he could properly prohibit this conduct which was, after all, only akin to "pure speech." The record shows that before the issuance of the regulation the wearers of the buttons had participated themselves in action described by this Court as follows: "In the instant case, as distinguished from the facts in *Burnside,* there was more than a mild curiosity on the part of those who were wearing, distributing, discussing and promoting the wearing of buttons. There was an unusual degree of commotion, boisterous conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum." *Blackwell, supra,* p. 754. The Court further said: "Again we emphasize the difference in the conduct here involved and that involved in *Burnside.* In this case the reprehensible conduct described above *was so inexorably tied to the wearing of the buttons that the two are not separable.* In these circumstances we consider the rule of the school authorities reasonable." *Blackwell, supra,* p. 754. [Emphasis added].

It should be further borne in mind, that the only question before the Court in *Blackwell* was raised by an appeal from the denial by the trial court of a preliminary injunction, an order which it is usually thought the trial court has the broadest discretionary power to issue or deny. The Court saw fit in concluding, to say: "The judgment is affirmed but without prejudice to the right of the appellants to relief upon final hearing if the facts justify such relief, emphasizing

as we do the importance of the right of freedom of expression and communication as protected by the First Amendment, and the fundamental requirement that school officials should be careful in their monitoring of student expression in circumstances in which such expression does not substantially interfere with the operation of the school." *Blackwell, supra,* p. 754.

Once again, I read the language of this Court "in which such expression does not substantially interfere with the operation of the school" as being limited to the acts of the speakers themselves and not the acts of others who may fortuitously act irresponsibly and destructively on their own.

Here we have an appeal from a final judgment which has resulted in the suspension for one or two terms of college of students who, according to the findings, have been found guilty of nothing more than peaceable assembly and speech urging conduct by others, to be carried out peaceably.[4]

They were punished as being vicariously responsible for the specific acts of others, many of whom were identified and punished separately for proven acts of vandalism and who are not now before the Court.

I would hold that in the absence of any proof that these four appellants participated in any of the acts of violence and in light of the fact that none of them urged such acts upon other students, their acting as "organizers," "leaders" and "instigators" of the movement to cause a boycott of classes to make the University authorities listen to a list of grievances was protected activity under the First Amendment as made effective under the Fourteenth Amendment to this state institution.

---

**4.** It must also be borne in mind that there was neither charged against these students, nor was there a finding of fact to the effect, that the urging of a boycott or the engaging in a boycott was one of the grounds for their being punished.