Sadegh SHAMLOO et al.,
Plaintiffs-Appellants,

v.

MISSISSIPPI STATE BOARD OF TRUSTEES OF INSTITUTIONS OF HIGHER LEARNING et al., Defendants-Appellees.

No. 80-3035.

United States Court of Appeals,
Fifth Circuit.

July 2, 1980.

Robert Rubin, American Civil Liberties Union of Miss., Frank R. Parker, Jackson, Miss., for plaintiffs-appellants.

Ed Davis Noble, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.

Before THORNBERRY, FRANK M. JOHNSON, Jr. and HENDERSON, Circuit Judges.

THORNBERRY, Circuit Judge:

This court is called upon to assess the constitutionality of two university regulations that govern demonstrations held on the campus of Jackson State University (Jackson State). Sadegh Shamloo contends that the regulations violate his first amendment rights, that the regulations were discriminatorily and selectively enforced, and that the university disciplinary proceedings enforcing the regulations were unconstitutional for failing to provide due process of law.

The United States District Court for the Southern District of Mississippi disagreed and refused to grant a preliminary injunction. Because we find that the regulations are unconstitutionally vague, we must reverse the decision of the district court.

On December 12, 1979, Shamloo and Majid Mokhayeri filed their complaint as a class action on behalf of themselves and all Iranian students at Jackson State who were subjected to disciplinary proceedings for their participation in a demonstration on the campus of Jackson State. The complaint sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. Accompanying the complaint was a motion for a temporary restraining order to halt student disciplinary proceedings that were still in progress. On December 12, 1979, the United States District Court for the Southern District of Mississippi conducted a hearing on this matter, but on the next day refused to grant the temporary restraining order. Plaintiffs appealed this denial to this court, but the appeal was dismissed for lack of jurisdiction as an appeal from a nonappealable order. *Shamloo v. Mississippi State Board of Trustees of Institutions of Higher Learning*, No. 79–4042 (5th Cir. Dec. 27, 1979).

On December 28, 1979, appellants filed a motion for preliminary injunction seeking to stay enforcement of the student disciplinary actions and to reinstate the Iranians to their previous status as students. The district court conducted a hearing on this motion on January 8, 1980 and January 9, 1980. At the conclusion of the hearing, the district court refused to grant a preliminary injunction holding that (1) the Jackson State regulations are not unconstitutional, (2) the regulations were not selectively enforced, and (3) the student disciplinary

hearings did not constitute a denial of due process. This appeal follows.

*I. Facts.*

Appellants Shamloo, Mokhayeri, and thirty other Iranians, nationals who are in the United States pursuant to student visas, were enrolled students at Jackson State for the fall semester in 1979. These students participated in two student demonstrations on the campus of Jackson State to indicate their support of the new government in Iran under the Ayatollah Khomeini. These demonstrations were allegedly unauthorized because the students did not comply with Jackson State's regulations governing demonstrations.

The regulations, contained in the student handbook, "The Tiger," provide as follows:

Any student parade, serenade, *demonstration*, rally, and/or other meeting or gathering for *any purpose*, conducted on the campus of the institution must be *scheduled with the President or designated agent at least three (3) days in advance of the event.* Names of the responsible leaders of the group must be submitted to the institution at the time of scheduling. Organizations which meet at regular times and places may, at the beginning of each semester, schedule such meetings with the designated official.

*Students assembling for any meetings not authorized in accordance with the aforesaid paragraphs are subject to disciplinary action which may result in dismissal* from the institution. Students present at each unauthorized meeting are considered to be participants.

*All events sponsored by student organizations, groups, or individual students must be registered with the Director of Student Activities, who, in cooperation with the Vice President for Student Affairs, approves activities of a wholesome nature.* In some instances, the individual or group making the request will be counseled as to the inappropriateness of date, time, or place of the event. And thus, alternate schedules may be suggested, or the prevailing circumstances may warrant disapproval of the activity.

Jackson State University, The Tiger: Student Handbook, pp. 66–67, 48 (1978) (emphasis added). To schedule a demonstration with the "President or designated agent," a student must submit an Application For Use Of University Facilities (See Appendix A) and obtain the approval of five individuals. The testimony reveals that Shamloo was made aware of these regulations on October 5, 1979, in a meeting specifically called to explain to the Iranian students the Jackson State regulations and the Use of Facilities form with respect to their request for obtaining an off-campus speaker. Therefore, it is clear that Shamloo was aware of the requirement that he must give three days advance written notice of a student demonstration.

The first demonstration occurred on November 19, 1979. It was apparently held in response to the presence of officials of the Immigration and Naturalization Service on the Jackson State campus to review the status of the Iranian students at Jackson State. A group of Iranian students gathered in an area on the campus known as the "Plaza." The students did not comply with the Jackson State regulations by acquiring written permission so this was an unauthorized demonstration. Shamloo did speak with Dr. Johnson, Vice-President for Student Affairs, before the demonstration concerning the possibility of holding a meeting to discuss the state of affairs in Iran and the status of the Shah. But the testimony reveals that Dr. Johnson never gave Shamloo oral permission to hold a demonstration on the Plaza. Even if he had, the oral permission would not satisfy the Jackson State regulations requiring written permission. No disciplinary action was brought against the students for their participation in this demonstration.

The second demonstration occurred on November 29, 1979. At approximately 9:00 A.M., a group of Iranian students gathered on the Plaza. The student demonstration consisted of chanting, marching, and carrying signs. At approximately 9:15, Dr. Estus Smith, Vice-President of Academic Affairs, heard the chanting from his office in

the Administrative Tower. Dr. Smith asked the students to disperse because this was the week before "dead week" when students were meeting with their professors for the last time before final examinations and because the demonstration was disrupting classes. When Dr. Smith left the Plaza, the chanting resumed. At approximately 9:30 A.M., Captain Stringer, Director of Campus Security, was contacted by radio with regards to the demonstration. Upon determining that the students did not have written permission to demonstrate, Captain Stringer ordered the group to disperse.

The district court concluded that the demonstration had a disruptive effect with respect to the other students. Shamloo testified that, in his opinion, the demonstration was not disruptive. Dr. Johnson, Vice-President for Student Affairs, testified that the demonstration was "quite noisy," while Dr. Smith testified that it was "disrupting classes." Dr. Smith also testified as to the location of the Plaza with respect to other buildings on campus. The Academic Skills Center, dorms, a library, the School of Business, several faculty offices, and the Department of Political Science are located within 200 feet of the Plaza.

Again, Shamloo did not comply with the Jackson State regulations because he did not acquire written permission. Shamloo testified that he left messages with the secretaries of Dr. Johnson and Captain Stringer informing them of the planned demonstration. Dr. Johnson and Captain Stringer denied having received the messages. Also, this does not satisfy the requirement of obtaining written permission. Therefore, this demonstration was also unauthorized.

Pursuant to the mandate found in the regulations, Jackson State brought disciplinary action before the Student Affairs Committee of Jackson State against 32 Iranian students who participated in the demonstration. Though there was conflicting testimony as to the participation of non-Iranians in the demonstration, the district court concluded that only Iranians participated in the demonstration. Each student was given notice of a hearing and thereafter a closed hearing was held. Each student was advised of the charges and they were permitted to have counsel to act in an advisory capacity. The proceedings were taped and each student was entitled to listen to and transcribe the tape. At the conclusion of the hearing, notice of the decision of the panel was sent to each of the students. Two students were suspended for two semesters, eighteen students were suspended for one semester, eleven students were placed on disciplinary probation for their tenure at Jackson State, and the charges were dismissed against one student. Appeals were taken to Dr. Peoples, President of Jackson State, and he affirmed the decisions of the discipline committee.

## II. First Amendment.

It is clear after an examination of the testimony that the Iranian students were subjected to disciplinary action for failing to comply with the Jackson State regulations. Appellants initially contend that these regulations deny them their constitutional rights under the First Amendment. They claim that the regulations are unconstitutionally vague and overbroad and that they constitute an unconstitutional prior restraint. The proper method of analyzing these claims is suggested by this court's decision in *Jenkins v. Louisiana State Board of Education*, 506 F.2d 992 (5th Cir. 1975). We must first determine whether the regulations were violated. We then must consider whether Jackson State's action in suspending appellants violated their First Amendment rights by determining whether their action was "protected." Then, we may examine the constitutionality of the regulations.

The Jackson State regulations provide that any student demonstration for any purpose conducted on the campus must be scheduled with the President or his designated agents at least three days in advance. The names of the leaders of the demonstration must be submitted to Jackson State. All events must be registered with the Director of Student Activities. This is accomplished by submitting an Application For

Use Of University Facilities. Students assembling for any unauthorized meeting are subject to disciplinary action which may result in their dismissal from Jackson State. The testimony shows that Shamloo was aware of these regulations and their requirements.

■ The testimony reveals that neither Shamloo nor any of the other Iranian students complied with these regulations. The activity on November 29, 1979, can certainly be classified as an on-campus demonstration. It was not scheduled with the President of Jackson State or one of his agents at least three days in advance. The only evidence that Shamloo attempted to "schedule" the demonstration was his testimony that he called the offices of Dr. Johnson and Captain Stringer and informed their secretaries of the demonstration planned for the *next day*. Dr. Johnson and Captain Stringer testified that they never received such notification. Shamloo never contacted the Director of Student Activities and never "registered" with him by filing an Application For Use Of University Facilities. There is conflicting testimony concerning whether Shamloo even received oral permission. Shamloo spoke with Dr. Johnson about scheduling a meeting to discuss the state of affairs in Iran but he apparently never received permission to conduct a demonstration on the Plaza.

Although we have found evidence supporting the disciplinary committee's determination that the Iranian students violated the Jackson State regulations, we must next consider whether the suspension and probation of appellants violated their First Amendment rights by punishing them for protected activity. This issue must be addressed in light of the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and this court's decisions in *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966), and *Blackwell v. Issaquena County Board of Education*, 363 F.2d 749 (5th Cir. 1966).

■ The Supreme Court stated in *Tinker* that students are entitled to their First Amendment rights, even in light of the special characteristics of the school environment. Colleges and universities are not immune from the requirements of the First Amendment. *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). A demonstration is a method of expression often entitled to First Amendment protection, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), and university students are usually immunized from suspension or other disciplinary action in retaliation for the exercise of their First Amendment rights. *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973). Although "the First Amendment leaves no room for the operation of a dual standard in the academic community with respect to the content of speech," *id.* at 671, 93 S.Ct. at 1200, the Court in *Tinker* recognized the need for authorizing school officials to prescribe and control *conduct* in the schools in a manner consistent with constitutional safeguards. The right of a student to participate in a demonstration is not unbridled since First Amendment rights are not unlimited constitutional guarantees that may be exercised at any time, at any place, and in any manner. *Jenkins*, 506 F.2d at 1002.

The test to be applied when confronted with the conflict between a student exercising his First Amendment rights and the regulations adopted by a university were first enunciated by this court in *Burnside*. The Supreme Court later adopted the *Burnside* test in *Tinker* when it stated that a student may exercise his First Amendment rights:

. . . if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. *Burnside v. Byars*, supra, 363 F.2d at 749. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of

the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. Cf. *Blackwell v. Issaquena County Board of Education,* 363 F.2d 749 (C.A. 5th Cir. 1966). *Tinker, supra,* 393 U.S. at 513, 89 S.Ct. at 740.

Application of this standard is best demonstrated by an examination of this court's decisions in *Burnside* and *Blackwell* decided on the same day by the same panel. In both cases, high school principals announced a rule denying students the right to wear "freedom buttons" while attending school Some of the students refused to remove the buttons and they were suspended. This court in *Blackwell* ordered the students reinstated because the regulation was deemed arbitrary and unreasonable in the absence of a showing that the presence of the buttons caused a commotion, distracted other students, or interfered with other education activity. In *Blackwell,* this court sustained the suspensions because the record revealed that the students wearing the buttons created "a state of confusion, a disruption of class instruction and a general breakdown of orderly discipline." *Blackwell, supra,* 363 F.2d at 751 n. 2. The different reaction by the other students at each high school accounted for the different results in the two cases.

The record here contains conflicting and unconvincing evidence concerning whether the demonstration involved material and substantial interference with the requirement of appropriate discipline in the operation of an educational institution. Unlike in *Jenkins* and *Blackwell,* there was no testimony by the students or teachers complaining that the demonstration was disrupting and distracting. Shamloo testified that he did not think any of the classes were disrupted. Dr. Johnson testified that the demonstration was quite noisy. Dr. Smith testified that he could hear the chanting from his office and that, in his opinion, classes were being disrupted. The only justification for his conclusion is that there are several buildings within a close proximity of the Plaza that students may have been using for purposes of study or for classes. There is no evidence that he received complaints from the occupants of these buildings.

The district court concluded that "the demonstration had a disruptive effect with respect to other students' rights." But this is not enough to conclude that the demonstration was not protected by the First Amendment. The court must also conclude (1) that the disruption was a *material* disruption of classwork or (2) that it involved *substantial* disorder or invasion of the rights of others. It must constitute a *material* and *substantial* interference with discipline. The district court did not make such a conclusion and we certainly cannot, especially in light of the conflicting evidence found in the record. We cannot say that the demonstration did not constitute activity protected under the First Amendment. This issue must be addressed when this case is decided on the merits. Therefore, we must decide this case on the basis of the constitutionality of the regulations.

Appellants challenge their suspension and probation on the grounds that the Jackson State regulations are vague and overbroad and that they constitute an impermissible prior restraint. While the idea of a regulation being unconstitutionally vague and overbroad has previously been applied to regulations of an educational institution, it is important to realize that school disciplinary regulations need not be drawn with the same precision of a criminal code. *Jenkins, supra,* 506 F.2d at 1004. But the regulations must be reasonable as limitations on the time, place, and manner of the protected speech and its dissemination. *Papish v. Board of Curators of the University of Missouri,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Disciplinary action may not be based on the disapproved *content* of the protected speech. *Papish, supra,* 410 U.S. at 670, 93 S.Ct. at 1199.

The reasonableness of a similar university regulation was previously addressed by this court in *Bayless v. Martine,* 430 F.2d 872,

873 (5th Cir. 1970). In *Bayless*, ten students sought injunctive relief from their suspension for violating a university regulation. The regulation in *Bayless* created a Student Expression Area that could be reserved 48 hours in advance for any nonviolent purpose.[1] All demonstrations similar to the one held by the Iranian students were regulated to the extent that they could only be held at the Student Expression Area "between the hours of 12:00 noon to 1:00 p. m., and from 5:00 to 7:00 p. m." but there was no limitation on the *content* of the speech. This court noted that the requirement of 48 hours advance notice was a reasonable method to avoid the problem of simultaneous and competing demonstrations and it also provided advance warning of the possible need for police protection. This court upheld the validity of the regulation as a valid exercise of the right to adopt and enforce reasonable nondiscriminatory regulations as to the time, place, and manner of a demonstration.

There is one critical distinction between the regulation examined in *Bayless* and the Jackson State regulation. The former made no reference to the *content* of the speech that would be allowed in the Student Expression Area. As long as there was no interference with the flow of traffic, no interruption of the orderly conduct of university affairs, and no obscene material, the students were not limited in what they could say. Apparently, the same cannot be said with respect to the Jackson State regulations which provide that only "activities of a *wholesome* nature" will be approved. And if a demonstration is not approved, the students participating may be subjected to disciplinary action including the possibility of dismissal.

 Limiting approval of activities only to those of a "wholesome" nature is a regulation of *content* as opposed to a regulation of time, place, and manner. Dr. Johnson testified that he would disapprove a student activity if, in his opinion, the activity was unwholesome. The presence of this language converts what might have otherwise been a reasonable regulation of time, place, and manner into a restriction on the content of speech. Therefore, the regulation appears to be unreasonable on its face.

 The restriction on activities other than those of a "wholesome" nature raises the additional issue that the Jackson State regulation may be void for vagueness. A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). The degree of specificity required in regulations affecting First Amendment rights is even greater. *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). An individual is entitled to fair notice or a warning of what constitutes prohibited activity by specifically enumerating the elements of the offense. *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). The regulation must

---

1. The regulation examined in *Bayless* provides as follows:

STUDENT EXPRESSION AREA

Students and University personnel may use the Student Expression Area located on the grass terraces in front of Old Main between the hours of 12:00 noon to 1:00 p. m., and from 5:00 to 7:00 p. m. Reservations for the Student Expression Area are made through the Dean of Students Office and must be made at least 48 hours in advance.

Rules to be observed by users of the area include:

1. No interference with the free flow of traffic.

2. No interruption of the orderly conduct of University affairs.

3. No obscene materials.

4. Person making the reservation is responsible for seeing that the area is left clean and in a good state of repair.

When a registered student organization plans to invite a non-University person to address a meeting, his name must be submitted to the Dean of Students Office at least 48 hours before the event.

*Bayless, supra*, 430 F.2d at 875.

not be designed so that different officials could attach different meaning to the words in an arbitrary and discriminatory manner. *Id.* But, of course, we cannot expect "mathematical certainty" from our language. *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809 (5th Cir. 1979). The approach adopted by this court with respect to university regulations is to examine whether the college students would have any "difficulty in understanding what conduct the regulations allow and what conduct they prohibit." *Jenkins, supra*, 506 F.2d at 1004.

The requirement that an activity be "wholesome" before it is subject to approval is unconstitutionally vague. The testimony revealed that the regulations are enforced or not enforced depending on the purpose of the gathering or demonstration. Dr. Johnson admitted that whether or not something was wholesome was subject to interpretation and that he, as the Vice-President of Student Affairs, and Dr. Jackson, Director of Student Activities, could come to different conclusions as to its meaning. He also stated that "wholesome" has a different meaning "in the legal word" as opposed to its meaning in the "educational word" and that two people might disagree very widely on what is and is not wholesome. The regulation's reference to wholesome activities is not specific enough to give fair notice and warning. A college student would have great difficulty determining whether or not his activities constitute prohibited unwholesome conduct. The regulation is void for vagueness. Because we have already found that the regulations governing demonstrations that were the basis for the disciplinary action brought against the Iranian students were not reasonable regulations of time, place, or manner but restrictions on the content of speech and because we have found the regulations void for vagueness, we need not address the other First Amendment issues raised by appellant. We conclude that appellants were disciplined for violating an unconstitutional regulation.

## III. *Equal Protection and Due Process.*

Appellants next claim that the Jackson State officials violated the rights of the Iranian students under the equal protection clause by selectively enforcing the regulations only against the Iranian students. Appellants also contend that the student disciplinary proceedings failed to comply with the requirements of the due process clause. This court has stated its concern that cases are to be decided on the narrowest legal grounds available. *Penthouse International Ltd. v. McAuliffe*, 610 F.2d 1353, 1362 (5th Cir. 1980); *Korioth v. Briscoe*, 523 F.2d 1271, 1275 (5th Cir. 1975). This is especially important when dealing with constitutional questions as in this case. This position is further supported by the posture of this case as it comes before us. The relief sought by appellants is the reversal of a denial of a motion for preliminary injunction. Therefore, we are not concerned so much with each issue raised as the "*substantial likelihood* that plaintiff will prevail on the merits." *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). We have already concluded that the district court erred because appellants were subjected to disciplinary action for violating an unconstitutional regulation in light of the unconstitutionally vague nature of the regulations. Therefore, we need not address these additional constitutional issues.

## IV. *Preliminary Injunction.*

This court clearly established the requirements for granting a preliminary injunction in *Canal Authority of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974) as follows:

. . . (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary in-

junction will not disserve the public interest.

*Id.* at 473. The grant or denial of a preliminary injunction rests in the discretion of the district court. *Johnson v. Radford,* 449 F.2d 115 (5th Cir. 1971). We must determine whether the district court abused its discretion as bounded by the four prerequisites of *Canal Authority. Farshy v. Kagan,* 585 F.2d 749 (5th Cir. 1978).

■ We find that the district court abused its discretion in failing to grant the preliminary injunction. First, there is obviously a substantial likelihood that appellants will prevail on the merits since they were subjected to disciplinary action for violating a statute that is unconstitutional on First Amendment grounds. Second, the district court abused its discretion with respect to the final three requirements by basing its decision on the state of affairs in Iran with respect to the fifty hostages when he stated:

> There is no question about the public interest being involved, and the country from which these young men come has had the world in turmoil for 67 days—its students, maybe such as these, who have been demonstrating, parading and holding signs and downing people for 67 days and holding American hostages. In fact, through common sources, they tell you over the news media that the Khomeini they were talking about here doesn't rule Iran, but it's the students such as these who are parading and demonstrating, holding the reins of government and are running your government in a chaotic manner, and a rebellious manner.

> Therefore, with the temperament such as it is today existing between this country and those people, and with an unleashed, unbridled restriction towards such action, certainly there will be a disservice to the public if this injunction were granted. A grave disservice to the public. Should this Court grant this injunction which is asked for, then what safety and security does the Jackson State College have? What protection of equal rights and constitutional rights do the other 8,000 students have there, when you take the bridle off of those who are waiting to demonstrate some more, as according to the testimony in this case? Certainly there is a disservice to the public, which in my opinion outweighs any possible irreparable damage to these 31 students.

Record, pp. 272–73. This is certainly no basis for denying an injunction.

The order entered by the district court denying the motion for preliminary injunction is hereby vacated, the judgment is reversed, and the cause is remanded with directions to the district court to grant a preliminary injunction, consistent with this opinion, enjoining Jackson State from enforcement of its disciplinary proceedings which resulted in probation for or the suspension of 31 Iranian students.

REVERSED AND REMANDED WITH DIRECTIONS.

APPENDIX A

## JACKSON STATE UNIVERSITY
### Jackson, Mississippi
## APPLICATION FOR USE OF UNIVERSITY FACILITIES
**(Please Type)**

Date Filed _____

Organization making application _____

Facility desired _____

Nature of activity _____

_____

_____

Date(s) of activity _____ Hour to begin _____ Close _____

Name of person(s) in direct charge of activity _____

Name of chaperons, if required _____

Services required in connection with activity _____

Signature of person
making application _____
(Use ball point pen — Press Hard)
(IN CASE OF STUDENT ORGANIZATIONS, THE SPONSOR MUST SIGN)

Signature of supervisor of
facility to be used _____
(Use ball point pen — Press Hard)

Approved: _____ _____
 Director of Student Activities Dir. of Plant Operations
 (Use ball point — Press Hard)

Approved: _____ Charge, if any: $_____
 Comptroller
 (Use ball point — Press Hard)

Approved: _____
 Vice-President for Administration
 (Use ball point — Press Hard)

NOTE: This application is to be filled out at least three days prior to event. It is understood that any damages or loss to the building or equipment used are to be paid in full by the organization making this application. Please fill out in quadruplicate.