IRANIAN MUSLIM ORGANIZATION et al., Petitioners,

v.

CITY OF SAN ANTONIO et al., Respondents.

No. B–9850.

Supreme Court of Texas.

May 13, 1981.

Louis F. Linden, Houston, for petitioners.

Jane H. Macon, City Atty., Crawford B. Reeder, First Asst. City Atty., San Antonio, for respondents.

SPEARS, Justice.

This suit was filed by a group of Iranian students seeking a mandatory injunction to require the City of San Antonio to issue parade permits allowing them to demonstrate against the presence of the former Shah of Iran at Lackland Air Force Base in San Antonio. The trial court denied a temporary mandatory injunction and the court of civil appeals affirmed. 604 S.W.2d 379. We reverse the judgments below.

On December 3, 1979, about a month after the American hostages were seized in Iran, Ali Seyed Fanai Khayat and other members of the Iranian Muslim Organization (hereinafter referred to as the "Iranians") applied to the City of San Antonio (hereafter "City") for parade permits for two demonstrations. It is undisputed that the demonstrations, to protest against the former Shah of Iran, Rezi Pahlavi, were to be peaceful, as a prior demonstration by the Iranians had been. These applications evoked another application from the Ku Klux Klan to demonstrate at the same time and place as the Iranians. On December 4, the city manager denied these applications and announced that no permits would be issued any persons or groups on the Iranian issue. The Iranians then immediately filed this suit to permanently enjoin the City from interfering with their right of free speech and assembly and to temporarily enjoin the City to grant their parade permit. On December 6, a hearing was held by the district court on a temporary restraining order which was denied.

On December 10, five of the Iranians staged a hunger strike on the steps of City Hall. That demonstration ended two days later when the five Iranians were taken into protective custody by the police after an angry crowd stirred up by two disc jockeys gathered to taunt and threaten the demonstrators.

On December 11, the city council heard the Iranians' appeal from the city manager's decision. The council upheld the manager's action at the conclusion of a public hearing and further banned other demonstrations by passing unanimously the following motion:

> ... I move the Council uphold the Manager's decision and that permits be denied for public parades and/or demonstrations to the Iranian Muslim Student Association (sic) and others who encompass the cause either pro or con in the Iranian question.[1]

Then on December 17, following another hearing, the trial court denied a temporary injunction. The Iranians then appealed to the court of civil appeals which affirmed the trial court.

The court of civil appeals held that the denial of injunctive relief was justified. The court reasoned that because the Shah had already left the United States for Panama, no irreparable injury would occur to the Iranians arising out of their desire to be allowed to demonstrate while the Shah was still in San Antonio. The court concluded that there was "some basis upon which the trial court could have properly held that a mandatory order was not necessary to prevent irreparable injury" and that "the trial court did not abuse its discretion" in denying the temporary injunction.

The freedoms of speech, peaceable assembly and the right of petition, guaranteed by the first amendment to the Constitution of the United States, are basic to the fabric of our liberty.[2] The rights to picket and demonstrate in public places, particularly streets, sidewalks, and parks, are extended first amendment protection. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed 1423 (1939). The Iranians' march, if peaceful and orderly, falls well within the sphere of conduct protected by the first amendment. *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). The state may reasonably regulate the time, place and manner of the exercise of first amendment rights as necessary to the protection of other compelling public interests, *Grayned v. City of Rockford*, 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–3, 33 L.Ed.2d 222 (1972); *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2nd Cir. 1980); however, limitations on the right to regulate the exercise of first amendment rights are essential, so that when discretion is vested in administrative officials, it must be "appropriate, limited discretion under properly drawn statutes or ordinances." *Cox v. Louisiana, supra*, 379 U.S. 536, at 558, 85 S.Ct., at 466. Regulations which take the form of prior restraints are subject to particularly exacting judicial scrutiny with a heavy presumption against their constitutional validity. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Organization For a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *Carroll v. President and Commr's of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325, 331 (1968); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). As the U.S. Supreme Court said in *Virginia*

---

1. The City Attorney read the entire motion into the record at the hearing on the temporary injunction, at p. 14.

2. The first amendment to the United States Constitution reads:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

*Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976):

> We have *often* approved restriction [on time, place, and manner] provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information.

■ The one form of regulation which has never been approved by the supreme court is to restrict expression on the basis of the content or subject matter of that expression. *Hudgens v. NLRB*, 424 U.S. 507, 521, 96 S.Ct. 1029, 1039, 47 L.Ed.2d 196 (1976); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Cox v. Louisiana, supra*, 379 U.S. 536 at 557, 85 S.Ct. at 465. The court in *Mosley*, 408 U.S. at 95, 92 S.Ct. at 2290, announced that government not only is forbidden from discriminating between views it finds acceptable and those it finds unacceptable, but "it may not select which issues are worth discussing or debating in public facilities." The court further admonishes that "this court has condemned licensing schemes that lodge broad discretion in a public official to permit speech-related activity," citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) and many others. Moreover, the abhorrence or falsity of a doctrine does not justify its suppression. *Collin v. Smith*, 578 F.2d 1197, 1201 (7th Cir. 1978).

■ In the case before us, it is not significant that the permits were denied by the City of San Antonio by motion rather than by ordinance; the effect of the council's action in affirming the manager's decision was to deny the issuance of *any* permit to the Iranians and to others. This action, denying *all* who would exercise their first amendment rights of speech and assembly

on the subject of the Shah's presence is clearly content-based, and " 'thus slips from the neutrality of time, place, and circumstance into a concern about content.' This is never permitted." *Mosley, supra*, 408 U.S. at 99, 92 S.Ct. at 2292, citing Kalven, *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup.Ct.Rev. 29. That all would-be demonstrating groups were denied permits by the council's action without discrimination does not raise the content ban to the level that would pass constitutional muster. The privilege may be regulated, but not, in the guise of regulation, be abridged or denied. *Hague v. C.I.O., supra*, 307 U.S. 496 at p. 515–16, 59 S.Ct. at 963–64.

The City attempts to meet its "heavy burden" to legitimate its prior restraint by producing evidence of the fears of the city officials of the possibility that an audience hostile to the demonstrations would inflict physical violence on the Iranian demonstrators based upon confrontations between the Iranians and a hostile audience in the previous demonstration on May 10. The City also cites the potential danger to the American hostages then being held in Iran which might result from reprisals if any of the Iranian demonstrators were injured in the demonstration.

■ The evidence shows that the Iranian demonstrations were to be peaceful and orderly, and any violence directed against the demonstrators would not be retaliated against in kind. The potential danger feared by the city officials was the public disorder created by the hostile audience. Such fears are not a constitutionally permissible factor to be considered in regulating demonstrations. *Gregory v. City of Chicago, supra*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134; *Cox v. Louisiana, supra*, 379 U.S. at 551, 85 S.Ct. at 462; *Hague v. C.I.O., supra*, 307 U.S. 496 at 516, 59 S.Ct. 954 at 964.[3] As one writer aptly observed: "[I]t is unthinkable that such a 'heckler's

---

3. Several federal district courts have indicated that the fear of a hostile audience is *never* to be considered in ruling upon permit applications or granting injunctions against demonstrations. *See Stacey v. Williams*, 306 F.Supp. 963, 977 (N.D.Miss.1969); *Hurwitt v. City of Oakland*, 247 F.Supp. 995 (N.D.Cal.1965); *Williams v. Wallace*, 240 F.Supp. 100 (M.D.Ala.1965). We need not go that far.

veto' should rise to the dignity of a constitutional principle," justifying a prior restraint on free speech. Blasi, *Prior Restraints on Demonstrations*, 68 Mich.L.Rev. 1481, at 1510 (1970). Justice Cadena's dissent in the court of civil appeals correctly observes that the City's "evidence" consisted only of speculation about possible reprisals against the fifty hostages. It is clear, however, that "undifferentiated fear of disturbance cannot be the basis of a prior restraint." *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Nor does the "clear and present danger" test, first announced by Justice Holmes in *Schenck v. United States*, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), apply to this case. This doctrine has never been used to justify prior restraints on free speech. *Nebraska Press Ass'n v. Stuart, supra*. Rather, it has been employed by the courts only in the context of advocacy and incitement as a test of permissible punishment. *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

It is of great significance here that the City made no effort to resolve the perceived problem by permissible regulation of time, place, and manner. No effort was made to require that the demonstrations of the adversary groups be held at different locations along different routes or at different times.[4] The City's simplistic reflex was to ban completely all expressions by every group on the subject without consideration of any alternatives.

Further, the City seeks to justify the denial of the permit on the basis that the parade ordinance was not introduced into evidence and thus, there is nothing in the record to indicate that the Iranians' application complied with reasonable discretionary requirements which might be imposed by that ordinance. This argument is without merit as it ignores the overwhelming evidence in the record that the sole basis for the denial of the permit was the views sought to be expressed by the applicants.

The City neither alleged nor attempted to prove that the failure of the Iranians to comply with the parade ordinance was a ground for the denial of the permit. In its answer to the Iranians' petition, the City alleged only the potential danger to the hostages and possible disruption of public order as justification for the prior restraint. Similarly, there is no evidence in the record indicating that the denial of the permit was predicated on non-compliance with the ordinance.[5] The sole question at the temporary injunction proceeding and on appeal has been whether the City's absolute ban on all public parades encompassing the Iranian question represents an unconstitutional prior restraint on free speech so as to inflict an irreparable injury.

---

**4.** The dissenting opinion contains several references to alternatives considered by the City. First, there is *no* evidence that the city council considered any alternative locations or times. Second, Police Inspector Foresman, the acting Chief of Police when the permit was initially denied, had the power to grant, deny or grant an alternative application. He testified *without contradiction* that, when passing upon the permit in consultation with the City Manager and the City Attorney, no consideration was given to alternative times or locations. The only reference in the record that the dissent could possibly point to is a hearsay statement by the City Manager relating his conversation with a person who identified himself as Gary Sick, an employee of the National Security Council whose capacity, authority, or expertise is not reflected in the record. Although the City Manager testified that he "stressed" to Gary Sick that he "could think of about five alterna-

tive actions," there is no evidence of what they were or that they were revealed to or discussed with anyone else. The enigmatic term "actions" was never explained.

This is not to say that the City did not act in good faith. On the contrary, it is evident that all of the city officials acted in good faith; however, the question before us is not whether good faith was exercised but is a question of law, viz. whether this prior restraint of first amendment rights was permissible under the United States Constitution.

**5.** Even though the City Manager announced at a press conference that one of the reasons for denial was the failure of the Iranians to request a permit fifteen days in advance of the anticipated date of the demonstration, that reason was not asserted by the City in the court proceedings to justify its prior restraint.

We hold that in this case the City has failed to meet its "heavy burden" to justify the imposition of a prior restraint on the exercise of free speech.

Finally, we observe that while the court of civil appeals correctly stated that the issuance of a preliminary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship, the test was improperly applied in this case where a constitutional right of free speech was being stifled by an unconstitutional ban. The court of civil appeals held that the trial court did not abuse its discretion in denying the injunction, presumably because the Shah had already left the United States for Panama. In *Southwestern Newspapers Corp. v. Curtis*, 584 S.W.2d 362, 365 (Tex. Civ.App.—Amarillo 1979, no writ), the court correctly stated:

> In the classical sense, the granting of a temporary injunction is not warranted in the absence of some evidence establishing probable injury if the temporary injunction is not granted.... But the legalism has no efficacy if there is a deprivation of a First Amendment freedom, for any significant denigration of First Amendment rights inflicts irreparable injury ... and constitutes irreparable harm. In brief, "any delay in the exercise of First Amendment rights constitutes an irreparable injury to those seeking such exercise." ...

In dealing with the ultimate issue of the trial court's discretion, the court held at p. 368:

> The publisher has plead and shown by nonconflicting evidence the denial of a constitutionally guaranteed right which, as a matter of law, inflicts an irreparable injury. Upon the pleadings and proof, the publisher established its entitlement to the preservation of the status quo pending a trial on the merits of the right to a permanent injunction. Accordingly and absent some other legal ground for the refusal of relief to the publisher, it was a clear abuse of discretion for the trial court to deny a writ of temporary injunction. Cf. *Henry v. Greenville Airport Commission*, 284 F.2d 631, 633 (4th Cir. 1960), holding that a court has no discretion to deny relief by a temporary injunction where a violation of a constitutional right is clearly established.

The federal courts have also held that the denial of First Amendment rights inflicts irreparable injury. *Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 181, 421 F.2d 1111, 1116 (1969). See also *Shamloo v. Mississippi State Board of Trustees of Institutions of Higher Learning*, 620 F.2d 516, 525 (5th Cir. 1980), involving Iranians demonstrating on a college campus during the holding of the fifty hostages in Iran.

We are here constrained to observe that this case should have been tried on the merits in the trial court long before now. As pointed out earlier, the only question before the trial court in a temporary injunction hearing is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). The ruling on the temporary injunction may not be used to obtain an advance ruling on the merits; the question to be decided on appeal is whether the trial court abused its discretion in granting or denying the temporary injunction. *Houston Independent School District v. City of Houston*, 443 S.W.2d 49, 50 (Tex.1969); *Transport Co. of Texas v. Robertson Transports*, 152 Tex. 551, 261 S.W.2d 549, 552 (1953); *McCullars v. Van Winkle-Hooker Co.*, 611 S.W.2d 453, 454–5 (Tex.Civ. App.—Dallas 1980, no writ); *Plant Process Equipment, Inc. v. Harris*, 579 S.W.2d 53, 55 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ). Although both parties are ordinarily entitled to a separate trial on the merits on the application for a permanent injunction, the parties may agree to waive the separate trial, combine the two proceedings, and try the temporary and permanent injunction in the same trial. *See Houston Belt & T. Ry. Co. v. Texas & New Orleans Railroad*, 155 Tex. 407, 289 S.W.2d 217, 219 (1956); Lowe, 6 Texas Practice, Remedies,

§ 243, p. 236 (1973). If the parties can't agree, the trial court should advance the trial on the merits so as to eliminate two hearings and two appeals. *Southwest Weather Research, Inc. v. Jones*, 160 Tex. 104, 327 S.W.2d 417, 421–22 (1959); *Crawford Energy, Inc. v. Texas Industries, Inc.*, 541 S.W.2d 463, 468 (Tex.Civ.App.—Dallas 1976, no writ). This case is illustrative of one where either procedure should have been followed. Not only would judicial resources have been conserved, but equally importantly, the parties would have obtained the speedier resolution of their dispute.

While the procedure suggested is desirable, in a situation such as we have before us, the U.S. Supreme Court has held that First Amendment rights may not be denied during the period of appellate review, normally lasting a year or more to complete, without providing strict procedural safeguards, including immediate appellate review. *National Socialist Party v. Village of Skokie*, 432 U.S. 43, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977).

█ We now turn to the question of the Iranians' entitlement to a mandatory injunction requiring the City to issue the requested parade permits. Although the permits were requested for a date long past and under conditions which no longer exist, both sides agree in urging that the controversy is not moot.[6] We agree. As the United States Supreme Court observed in *Nebraska Press Ass'n v. Stuart, supra*, 427 U.S. 539 at 546, 96 S.Ct. 2791 at 2797:

> [J]urisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one "capable of repetition, yet evading review."

*See also State v. Lodge*, 608 S.W.2d 910 (Tex.1980) where this court recognized this principle. Because temporary orders imposing prior restraints upon free speech are by nature short-lived, we hold that the action of the City in this case and upheld by the courts below, is "capable of repetition, yet evading review." *Nebraska Press Ass'n v. Stuart, supra; Southern Pacific Terminal Co. v. I.C.C. and Young*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

The judgments of the courts below denying the temporary injunction are reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

BARROW, J., files dissenting opinion in which GREENHILL, C. J., and McGEE and DENTON, JJ., join.

BARROW, Justice, dissenting.

I respectfully dissent.

I agree with the fundamental proposition that prior restraints on free speech are presumptively unconstitutional and thus there is a heavy burden upon a governmental body to show justification for imposition of a prior restraint. However, in considering that proposition here, the majority opinion misconstrues the factual background and the posture of this appeal. This has resulted in an advisory opinion which misinterprets the holdings of the courts below and does a great disservice to the conscientious efforts of the acting Police Chief, the City Manager and the City Council of San Antonio to balance the freedom of the Iranian students to demonstrate with the duty of the City to maintain public order. Overshadowing the whole controversy was the well-being of over 50 Americans then being held

6. Despite the view expressed in the dissenting opinion that the controversy is moot, neither side agrees. The ban on all expression on both sides of the question still stands. The city's attorney stated in oral argument that even though the hostages had been released, *the City still refuses to issue any permit*:

> JUDGE: In other words, the sum and substance of that is you still deny the permit?
> ATTORNEY: We still deny the permit—we never have offered them a permit.

Furthermore, notwithstanding the assertion in the dissenting opinion, there is no testimony in the record of any city official that anyone now wishing a permit to demonstrate on the Iranian question may now have one; the dissent merely assumes so. In any event, whether permits would now be issued is irrelevant to the constitutional issue at hand because irreparable injury has already occurred.

hostage by Iranian students in the American Embassy in Iran.

The majority opinion is advisory because the appeal from the denial of petitioners' application for temporary mandatory injunction to require the City Council to issue them a parade permit is now moot and, therefore, this appeal should be dismissed.[1] Art. V, Sec. 8, Tex.Const.; *Firemen's Ins. Co. of Newark, New Jersey v. Burch*, 442 S.W.2d 331 (Tex.1968). Furthermore, since only an interlocutory order is before us, we do not adjudicate any issue but simply remand for trial on the merits. This has been the status of the case from the onset.

The basis for the denial of the parade permits to the Iranian Muslim Organization[2] (IMO) was concern over possible repercussions to the American hostages. While this case was on appeal, all hostages were released. It is clear *from the record* that if the IMO or anyone else wishes now to have a parade pro or con on the Iranian question, they need but to apply for a permit. All city officials so testified. Conclusive support for their good faith is shown by the undisputed evidence that the IMO was granted a permit to parade before the American hostages were captured. The IMO has not requested a permit after the hostages were released; nor has the City denied such a permit to anyone else after the hostages were released.

It must be recognized that this is an appeal from an interlocutory order and the evidence has not been fully developed. Under settled rules of this Court, the merits of the cause are not presented for appellate review in an appeal from the denial of a temporary injunction. The majority recognizes this rule and grants no relief. Appellate review is strictly limited to a determination of the question of whether there has been a clear abuse of discretion by the trial court in denying the interlocutory order. *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978). This was the only question before the court

of civil appeals. Accordingly, the majority in that court did not pass on the merits of the case, nor does the majority here.

It is necessary to review the factual background of this case in order to understand the action of the city officials and the holdings of the lower courts. In early 1979, the government of the Shah of Iran was overthrown and the Shah fled to Mexico. In October 1979, he was permitted to enter the United States for treatment at a New York hospital. It is undoubtedly a historical understatement to say the Shah's entry into the United States set off a torrent of anti-American activity by Iranian college students in the United States and also in Iran. In fact, the IMO was granted a permit by the city officials and held a parade or demonstration in San Antonio shortly after the Shah went to New York, but before the hostages were captured. On November 4, 1979, a mob of Iranian students overran the American Embassy in Iran and captured a number of American servicemen and employees stationed in the embassy. Understandably, most American citizens were outraged at the actions of the Iranian students both here and abroad.

On December 2, 1979, the Shah was released from the New York hospital and flown to Lackland Air Force Base, located near San Antonio, for further treatment. On December 3, 1979 the IMO applied to the San Antonio Chief of Police for permits to hold two parades on December 7, 1979. One parade was to be held just outside the main gate of Lackland Air Force Base and was to consist of 400 persons. The other parade was to proceed through the heart of downtown San Antonio between 2:00 and 4:30 p. m. and was to consist of from 100 to 1,000 persons. Shortly after the IMO applications, a purported representative of the Ku Klux Klan sought permits for the same times and places to demonstrate against the Iranian students. A group identified as

---

1. It is fundamental that the Court's power to render advisory opinions cannot be conferred by agreement of the parties. *Firemen's Ins. Co. of Newark, New Jersey v. Burch*, 442 S.W.2d 331, 335 (Tex.1968).

2. Petitioner, Ali Seyed Fanai Khayat, alleged that the Iranian Muslim Organization is an unincorporated association of Iranian students.

"Americans for Freedom" also sought a permit.

The acting Police Chief sensed the outrage of the public over the holding of the American hostages by the Iranian students and was concerned about the possibility that the parades sought by the IMO would result in violence.[3] The City Manager was advised by a representative of large Mexican-American organizations in San Antonio, who himself was very active in civil rights movements, that granting a parade permit to the Iranian students would present a serious threat to the safety of the students. He said that "Chicanos were included among the hostages" and that the people in the "barrio" were upset over this fact and would probably respond to demonstrations by the Iranian students with violence. The Chairman of the San Antonio Coalition Against Racism, which consisted of some 34 civil rights organizations, expressed the same opinion and concern.

The acting Police Chief determined that a minimum of 400 officers would be needed to provide safety to the parades. He checked with other law enforcement agencies in the area and with the Department of Public Safety in Austin to determine if the City could borrow other peace officers. The acting Police Chief concluded after investigation that the police department could not provide the necessary security for the requested parades at these times and places without disrupting all other normal police duties. He reported this information and his conclusions to the City Manager.

The City Manager consulted with officials of the Department of Justice, the National Security Council and the State Department. All of these officials expressed concern that any harm to the parading Iranian students might result in repercussions to the hostages being held by the students in Iran. After consideration of several alternatives, the City Manager on December 4, 1979 denied the parade permits to both the IMO and the Ku Klux Klan. He gave the following reasons:

a. In the judgment of the city manager a demonstration would divert a large number of police officers from their normal duties, interfering with normal protection.

b. In the judgment of the city manager the demonstration applied for by Plaintiffs would cause injury to persons or property and create a disturbance.

c. The permit was not requested 15 days in advance of the anticipated date of the demonstration.

d. The demonstration would disturb the flow of traffic.

e. That the demonstration would not be free from unreasonable delays.

f. If the IMO were allowed to demonstrate and the Ku Klux Klan's permit was denied, the latter would stage an illegal demonstration.

On December 6 the IMO filed this suit and sought a temporary restraining order; the IMO prayed that: (1) upon hearing, an injunction be granted enjoining the City from enforcing Ordinance No. 36221,[4] and

---

**3.** City officials should consider such portents of violence when imposing time, place and manner restrictions on demonstrations. *See Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir., 1980). Only in this manner can they prevent "danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order" (*Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)) and thus meet their "duty and responsibility to keep their streets open and available for movement." (*Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 452, 13 L.Ed.2d 471 (1965)). The fulfillment of this duty by city officials is "one of the means of safeguarding the good order upon which they

[civil liberties] ultimately depend" *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762 85, L.Ed. 1049 (1941) and one of the elements of civilized society "without which liberty itself would be lost in the excesses of anarchy." (*Cox v. Louisiana, supra*).

**4.** This ordinance was not introduced into evidence, but is alleged to be an ordinance setting out procedures for the obtaining of a parade permit. This Court cannot, and has not, taken judicial notice of the ordinance. *City of Austin v. Walton*, 68 Tex. 507, 5 S.W. 70 (1887).

The Supreme Court has recognized the validity of a limited ordinance conditioning a public demonstration on the obtaining of a parade

(2) that the City be ordered to issue a parade permit for IMO for December 7, 1979. It was alleged that the Shah's proximity was crucial to the IMO's planned demonstrations and that his visit to San Antonio was temporary. A hearing on the application for a temporary restraining order was held on December 6, 1979. Plaintiff, Ali Seyed Fanai Khayat, testified that he had made the parade applications on behalf of the IMO. He testified that the permits were sought with such expedience because the demonstration would lose its effectiveness if the Shah left San Antonio before the parades took place. He was the only Iranian student or member of the IMO that testified.

Testimony in support of the denial of the parade permits was given by the acting Police Chief and the City Manager. To say that City's action was based on "simplistic reflex" is to ignore the uncontradicted evidence in this case. The City Manager testified that five alternatives were weighed before he concluded to deny the parade permits.[5] Specifically, the possibility of trying to keep the IMO and KKK parades separated was considered and rejected because the Iranian students would attract

---

permit (*Cox v. New Hampshire, supra*). The purpose of such an ordinance is to further "the constitutional guarantee of liberty" which in and of itself depends on the "existence of an organized society maintaining public order, without which liberty itself would be lost. . . ." (*Cox v. Louisiana, supra.*) It is for this reason the United States Supreme Court has upheld the convictions of persons for demonstrating without a parade permit even though the permit was wrongfully refused them. *Poulos v. New Hampshire*, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105, 30 A.L.R.2d 987 (1953). In *Poulos* the Court said:

> The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction. . . .
> There is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. . . .
> . . . .
> The valid requirements of license are for the good of the applicants and the public. . . . Delay is unfortunate, but the expense and annoyance of litigation is a price citizens must pay for life in an orderly society where the rights of the First Amendment have a real and abiding meaning. . . .

Since we do not have the parade ordinance before us, we cannot determine the constitutionality of that ordinance, nor can we determine whether the IMO had complied with it. Neither could the trial court have made these determinations at the interlocutory hearing without introduction of the ordinance.

5. The City Manager testified as follows:

> Well, the decision was made in the same fashion I make so many, and that is that I sat down with the City Attorney, and with the acting Police Chief, and, as I recall, somebody else was there—whose name doesn't come to mind at this time—and we made a number of scenarios, all the way from granting the permit as requested, one or both of them, to denying all of them, and including interim steps such as imposing a 15-day waiting period. We weighed the pros and cons of each one, and in this case it was the unanimous feeling of all the persons in the office that the permit ought to be denied.
> . . . .
> Basically, what I stressed to Gary Sick [Iranian Affairs at the National Security Council] was that I could think of about five alternative actions, all of which could end badly, simply because there might have to be police action affecting the Iranians and/or others, and that those actions might be cause for retaliating against the American hostages, and I told him that I was leaning toward denying both the permit for the Iranian Muslim Organization and, obviously, as well the Ku Klux Klan Organization. My concern was that, having denied it, I thought there was a 50-50 possibility that if the demonstration and/or parade were to occur, it would occur anyhow, and if that occurred, it would be my direction to the police department to give them, that is, those persons breaking the law, fair warning, and if they failed to heed that fair warning within a reasonable period of time, then the police department would be ordered to arrest the demonstrators, and I was afraid that the act of arresting the demonstrators would incense the Iranians holding our hostages, and Gary Sick advised me that persons in Washington, including President Carter, had gone through exactly the same set of scenarios, and that it was their conclusion that the least offensive action that might be taken would be to arrest the Iranians for violating a law, as opposed to stronger police action and a melee between demonstrators and anti-demonstrators.
> . . . .
> I talked with the City Council about what I thought were the possible consequences of various actions, yes.

the citizens who were outraged over the capture of the hostages. The probability of violence in the event of a parade by the Iranian students was corroborated by the testimony of the two concerned civil rights leaders in the community. At the conclusion of the hearing, the application for a mandatory temporary retraining order was denied by the trial court.

On December 7, 1979, the IMO appealed the denial of the parade permit applications to the City Council, allegedly pursuant to Section 38–100.17.[6] A hearing before the City Council was held the night of December 11, 1971, and, after a full discussion, the City Council unanimously voted to uphold the City Manager's decision in denying the parade permits.

It is erroneously assumed in the majority opinion that the City Council resolution thereby banned *all* future demonstrations pertaining to the crisis in Iran. This misconstrues the action of the City Council. The only issue before the council at this meeting was the IMO appeal from the denials by the City Manager of its two applications for parade permits. Nevertheless, it was discussed at this council meeting that the Ku Klux Klan and another organization had also applied for and been denied parade permits by the City Manager. The only vote taken by the Council was on the question of whether the City Manager's action in denying the parade permits should be upheld. It was voted to uphold same.

On December 14, 1979, the IMO filed an amended petition. It was again alleged that the purpose of its demonstrations was to protest the temporary presence of the Shah in this country and specifically in San Antonio. It was urged that the IMO would suffer an irreparable injury if they could not demonstrate before the Shah left San Antonio. No other irreparable injury was alleged.

On December 17, 1979, a hearing was held on the IMO application for a mandatory temporary injunction. It was agreed by

the parties that the evidence heard on the application for a temporary restraining order should be considered as if presented as original evidence in the hearing. *None of the Iranian students gave any additional testimony.* The only additional evidence came from the acting Police Chief who testified relative to incidents that had happened after the December 6, 1979 hearing. At that time, five Iranian students had been permitted to demonstrate against the Shah on the City Hall steps for three days and, in fact, were furnished police protection for this purpose.

It was pointed out at the hearing on December 17 that the Shah had now left San Antonio and was in Panama. Nevertheless, the IMO still insisted on a permit. However, since no additional testimony was offered in behalf of this request, they stood on the testimony of December 6, 1979 that irreparable injury would occur to them unless permitted to parade while the Shah was in San Antonio. At the conclusion of this brief hearing, the application for a mandatory temporary injunction was denied. While there are no findings of fact, it is clear from the record that the sole reason for denying the temporary injunction was fear that violence inflicted on members of the IMO would result in harm to the hostages. The trial judge said:

> All you have to do is extend your logic a little to know that if you had a demonstration by the Iranians, there would be a demonstration by those opposed to the Iranians, and there would be some head knocking, maybe some blood spilled on the streets; and then Khomeini would have a good excuse to do away with the hostages.

The trial judge also pointed out that Ali Khayet had given the Shah's presence in San Antonio as the sole reason for wanting the parade permit and that the Shah had already left the United States. Therefore, no irreparable injury was shown to justify an interlocutory order.

6. This section was not introduced into evidence, but apparently is the City's parade ordinance.

**214**

The court of civil appeals, with one justice dissenting, affirmed the denial of the application for the mandatory temporary injunction. In doing so, the court *did not* consider the question to be properly determined upon trial of the merits of this cause as to the constitutionality of Ordinance No. 36221 or No. 38–100.17. The court of civil appeals held only that the trial court did not abuse its discretion in determining that the IMO was not entitled to a temporary mandatory injunction pending the final hearing. Obviously, the trial court could not grant a parade permit at that time *before* the Shah left the country. The court of civil appeals thus left open, for trial on the merits, the question of validity of the parade ordinance. This is the same result reached by the Court's judgment in this cause.

Before the application for writ of error reached this Court, our hostages were returned. Thus, the basis for the denial of the parade permits no longer exists. It is clear from this record that if the IMO applies for a parade permit, one will be granted by the city officials. Accordingly, this appeal which involves only the question of whether the trial court abused its discretion in not issuing a mandatory temporary injunction to order the City Council to issue the IMO a parade permit has become moot. The interlocutory judgment cannot have any practical effect upon an existing controversy.

There is nothing in the record to justify application here of the rule of "capable of repetition, yet evading review." There was no denial by the City of a parade permit sought by the Iranian students or anyone else until the hostages were captured and the situation became explosive. Hopefully, America will not be confronted with such a situation again. If we are, however, the considered action of the San Antonio city officials here sets a good pattern to follow. They successfully avoided bloodshed in an explosive situation and yet permitted the Iranian students to publicly air their position.

The question of whether the parade ordinance is constitutional is properly reserved for trial on the merits. This issue has been ripe for determination from the outset, but no setting has been requested by the IMO.

I would dismiss this appeal as moot.

GREENHILL, C. J., and McGEE and DENTON, JJ., join in this dissent.