**Affirmed and Opinion Filed February 17, 2022**



**In the**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-21-00546-CV**

**31 HOLDINGS I, LLC; 31 OPERATING, LLC; 31 GROUP, LLC; AND
KENNETH GOGGANS, Appellants**

**V.**

**ARGONAUT INSURANCE COMPANY, Appellee**

**On Appeal from the 439th Judicial District Court**
**Rockwall County, Texas**
**Trial Court Cause No. 1-21-0634**

## OPINION

Before Justices Reichek, Nowell, and Carlyle
Opinion by Justice Carlyle

Appellee Argonaut Insurance Company (Argo) filed this lawsuit against

appellants[1] seeking relief pertaining to an indemnity agreement. In this accelerated

interlocutory appeal, appellants challenge the trial court's order granting Argo's

request for a temporary injunction, claiming Argo did not satisfy the applicable

requirements for the requested relief. *See* TEX. CIV. PRAC. & REM. CODE

---

[1] In this opinion, "appellants" refers collectively to all four appellants: 31 Holdings I, LLC; 31
Operating, LLC; 31 Group, LLC; and Kenneth Goggans.

§ 51.014(a)(4). We reverse the temporary injunction order in part and otherwise affirm.

## Background

Argo is a surety company that issues payment and performance bonds for principals. In December 2019, Argo entered into a "General Indemnity Agreement" (the indemnity agreement) with appellants (the indemnitors) under which Argo agreed to issue twenty-four surety bonds relating to gas and oil interests (the bonds).[2] On September 9, 2020, and again on October 21, 2020, Argo demanded collateral and indemnification under the indemnity agreement regarding appellants' bonded obligations to the State of North Dakota. Appellants did not provide the demanded collateral or indemnification.

On May 4, 2021, Argo filed a combined petition and application for injunctive relief against appellants. Argo's petition contended, among other things, (1) "as a direct result of the Indemnitors' failure to provide the collateral in accordance with the Indemnity Agreement, the Surety has now incurred a loss of $3,140,000.00 related to an undisputed claim from the [State of North Dakota] on the Bonds," with additional claims expected, and (2) "[d]espite the Surety's Collateral Demands, Incurred Loss, and exposure to potential Loss, the Indemnitors are actively dodging the Surety and attempting to transfer and sell assets in which the Surety has a priority

---

[2] Mr. Goggans signed the indemnity agreement as an individual and as president of each of the other three appellants.

–2–

security interest under the Indemnity Agreement, with no intention of providing the proceeds, if any, to the Surety."

Argo asserted claims for indemnification, specific performance, and breach of contract. According to Argo, (1) "the Indemnitors are obligated to indemnify and save Argo harmless from and against every claim, demand, liability, loss and expense, including attorney's fees and costs, incurred by Argo in resolving claims against the Bonds or in enforcing the Indemnitors' obligations under the Indemnity Agreement"; (2) Argo "is entitled to an order compelling the Indemnitors to specifically perform their collateral security obligations under the Indemnity Agreement to deposit cash or other collateral security acceptable to Argo in the amount of $3,630,500.00 as security for Argo's Incurred Loss and Anticipated Loss under the Bonds"; and (3) "the Indemnitors breached the contract by failing to indemnify and hold harmless Argo and further by failing to provide the requested collateral upon request."

As to injunctive relief, Argo asserted:

> 60. Argo seeks a temporary restraining order . . . which:
> a. Restrains the Indemnitors from transferring, encumbering, or otherwise dissipating any of their assets, including the assets of any subsidiary or any funds received in the sale of any assets, until such time as the Indemnitors have complied with the collateral obligations; and
> b. Compels the Indemnitors to deposit or direct $3,630,500.00 of the sale proceeds received or to be received in connection with the sale of its assets to Empire . . . to Argo, or, alternatively, into the registry of the Court as collateral for Argo['s] pending trial on the merits.

61. . . . The status quo before Indemnitors' attempted sales was that Indemnitors owed Argo its collateral demand before any other encumbrance.

62. Argo has demonstrated that it has a right to its collateral demand. There is a substantial likelihood that Argo will succeed on the merits of its case.

63. . . . Argo has no adequate remedy at law, as without the injunction Argo will forever lose its bargained-for right to immediate exoneration. If Argo is to have the security for which it bargained for, the promise to maintain the security must be specifically enforced.

64. Furthermore, absent the temporary restraining order, Argo will suffer immediate, irreparable harm because it, if the sale is allowed to move forward without any collateral to Argo, it [sic] will forever lose its bargained-for rights under the Indemnity Agreement. Post judgment remedies are of little use to Argo when it is required to expend money in the present, as a result of the Indemnitors' collective failure to perform and fulfill their obligations.

65. Granting the temporary restraining order will protect Argo's bargained-for benefit of collateral security, avoid imposing the risk and burden of present exposure to liability for which the Indemnitors are primarily liable on Argo, and avoid or otherwise mitigate the risk that the Indemnitors may become insolvent, leaving Argo as a general unsecured creditor.

. . . .

68. Argo moves this Court . . . to issue a temporary injunction enjoining the same conduct for which Argo seeks a temporary restraining order.

Argo also filed a brief in support of its requested injunctive relief, with attached exhibits that included the indemnity agreement.[3]

---

[3] The indemnity agreement included the following provisions:

The term "Losses" shall mean any and all (a.) sums paid by Surety to claimants under the Bonds, (b.) sums required to be paid to claimants by Surety but not yet, in fact, paid by Surety, by reason of execution of such Bonds, (c.) all costs and expenses incurred in connection with investigating, paying or litigating any claim under the Bonds, including but not limited to legal fees and expenses, technical and expert witness fees and expenses, (d.) all costs and expenses incurred in connection with enforcing the obligations of the Indemnitors under this Agreement including, but not limited to interest, legal fees and expenses, (e.) all accrued and unpaid premiums owing to Surety for the issuance,

Appellants filed a general denial answer and opposing brief. They contended Argo "is not entitled to a temporary injunction because: (1) Plaintiff improperly seeks an injunction to enforce a contractual right; (2) the case law Plaintiff presented to the Court involving a more lenient temporary injunction standard is inapplicable; (3) Plaintiff has failed to establish imminent, irreparable harm; and (4) the relief requested is overbroad and unnecessary to ensure that Plaintiff is collateralized." Appellants asserted Argo "has failed to provide any evidence (let alone establish) that it cannot be adequately compensated through monetary damages" and "must

---

continuation or renewal of any Bonds and/or (f.) all other amounts payable to Surety according to the terms and conditions of this Agreement.

. . . [T]he Indemnitors hereby agree . . . as follows:
. . . .
2. **Indemnity**. To indemnify, hold harmless and exonerate Surety from and against any and all Losses, as well as any other expense that the Surety may incur or sustain as a result of or in connection with the furnishing, execution, renewal, continuation, or substitution of any Bond(s). . . . Payments of amounts due the Surety hereunder, including interest, shall be made immediately upon the Surety's demand. . . .
. . . .
4. **Collateral Security**. The Indemnitors acknowledge that the Bonds issued on their behalf are to be secured by collateral upon demand. In lieu of fully collateralizing the Bonds prior to their issuance and in consideration for the execution and/or delivery of one or more Bonds, the Indemnitors agree to deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses. If for any reason the Surety deems it necessary to increase the amount of any such deposit to cover any possible additional liability or loss, the Indemnitors shall deposit with the Surety, immediately upon the Surety's demand, an additional amount of collateral security equal to such increase. The Indemnitors acknowledge that the Surety would not issue any Bonds without the agreement of the Indemnitors to post collateral upon demand. Accordingly, the Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement to provide collateral under this Agreement (individually and collectively, the "Collateral Requirement"). The Indemnitors stipulate and agree that the Surety will suffer irreparable harm and will not have an adequate remedy at law should Indemnitors fail to perform the Collateral Requirement and further agree as a result that the Surety is entitled to specific performance of the Collateral Requirement.

further satisfy the heightened mandatory injunction standard" as to its request for disbursement of funds into the trial court's registry.

At the temporary injunction hearing, Robert Lavitt, Argo's vice-president, director of surety claims, and in-house counsel, testified this matter was first brought to his attention when Argo's underwriters advised him "that 31 Holdings had failed to make a required premium payment." He sent appellants the September 9, 2020 demand letter because appellants "had failed to pay premium on the anniversary date of the bonds, and there was concern also about a declining financial condition, deteriorating material financial condition." When Argo received no response, Argo's outside counsel sent the October 21, 2020 demand letter. Again, none of the indemnitors responded.

Mr. Lavitt testified he helped Argo's head of engineering, Kjel Brothen, draft a March 2, 2021 letter to Mr. Goggans. The letter's first paragraph stated, "I write to request a meeting with you as soon as possible as Argo has received claims from North Dakota, and your cooperation is urgently needed to save both Argo and you (as an indemnitor) money." That letter was sent by certified mail and U.S. first class mail. Additionally, Argo "hired a private investigator to camp out in front of Mr. Goggans' gated community." The investigator "attempted to deliver [the March 2, 2021 letter] to a woman who he believed to be Mrs. Goggans," but "she refused to accept it." The letter sent by certified mail "came back unmarked, unclaimed." The "regular mail" was "never returned" to Argo.

According to Mr. Lavitt, the State of North Dakota made three claims on the bonds. Before making payment, Argo "commenced an investigation" and "attempted to contact Mr. Goggans and our indemnitors for any information they had that would suggest that we not make payment." The total amount of payments Argo has made to the State of North Dakota is $3,580,000, which is the "total penal sums of the bonds enforced." The indemnitors have not provided any collateral or indemnification to Argo.

Mr. Lavitt also testified:

Q. . . . Since the collateral demands were made, has there been any activity with respect to 31 Holdings?
A. We learned that they were selling some of their assets from public filings, SEC filings, of an unrelated company named Empire. It was being reviewed by Argo's underwriters as part of their due diligence on Empire itself, and they came across the reference to purchase or potential purchase of assets of 31 and alerted me and the underwriters who worked on 31.
Q. Have you been made aware of any other assets that are being marketed by 31 Holdings or any of the subsidiaries or related companies?
A. We were aware also of a listing, Mr. Brothen identified it, of certain assets of 31, not located in North Dakota. They're located, I believe, in Colorado that are up for sale.

On cross-examination, Mr. Lavitt stated there are "no other potential payments to be made by Argo to the State of North Dakota with respect to the bonds at issue in this matter." He also testified:

Q. You reference a potential sale to the entity—I believe you said Empire; is that right?

A. Yes. Empire's financials stated that they—I was confused, 10-Ks and 10-Qs. I think it was a 10-K. They stated that they had entered into a contract to purchase assets from 31.
Q. Do you know if that potential transaction has closed?
A. I believe that my attorney has got a copy of a 10-Q that references the subsequent transaction.
Q. So—
A. I don't have personal knowledge of it. I would have to rely on what the 10-K or 10-Q says.

The exhibits admitted into evidence included the indemnity agreement, the bonds, the correspondence Mr. Lavitt described, and a 2021 "Form 10-Q" of Empire Petroleum Corporation. Empire's Form 10-Q contained the following paragraph:

> On March 22, 2021 the Company, through its wholly owned subsidiary, Empire ND Acquisitions, LLC, entered into a purchase and sale agreement with 31 Group, LLC to acquire among other things, certain oil and gas properties in North Dakota. The purchase price is $900,000, payable one year from the closing date, and is reduced by certain expenses which the Company may incur relating to the properties or assessment of certain wells as uneconomic for up to one year from the closing date. . . . The transaction closed on May 7, 2021.

The trial court signed a June 17, 2021 temporary injunction order that stated in relevant part:

> The Court finds Argo has demonstrated that (1) there is a substantial likelihood it will prevail on the merits of its claims; (2) it has no adequate remedy at law; (3) [it] has suffered irreparable injury; and (4) unless Indemnitors are restrained as set forth herein, Argo will continue to suffer immediate and irreparable injury as a result of Indemnitors' actions. The Court therefore enters the following findings and orders:
> 1. Argo will continue to suffer immediate and irreparable injury, loss, or damage in that the Indemnitors will be unable to indemnify and exonerate Argo in accordance with the Indemnity Agreement, unless the Indemnitors are enjoined from transferring, encumbering, or otherwise dissipating their assets, including any proceeds related to the

sale of its assets to Empire ND Acquisitions, LLC or any other third party.

2. This injury is irreparable because if the Indemnitors transfer, encumber or otherwise dissipate their assets, including any proceeds related to the sale of its assets to Empire or any other third party, they will be unable to indemnify and exonerate Argo in accordance with the Indemnity Agreement.

For these reasons, the Court **ORDERS** the following:

3. The Indemnitors are restrained from transferring, encumbering, or otherwise dissipating any of their assets.

4. Kenneth Goggans, individually, is authorized to maintain his normal and ordinary personal living expenses.

5. The Indemnitors are compelled to deposit or direct $3,630,500.00 as collateral to the Court's registry, or otherwise [sic] agreed by the Parties, to be held until a final adjudication on the merits. Such deposit of collateral shall occur within 30 days of this Order.[4]

## Standard of review and applicable law

A temporary injunction's purpose is to maintain the status quo of the litigation's subject matter pending a trial on the merits. *RWI Constr., Inc. v. Comerica Bank*, 583 S.W.3d 269, 275 (Tex. App.—Dallas 2019, no pet.) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)). Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204. A reviewing court should reverse an order granting injunctive relief only if the trial court abused that discretion. *Id*. In the temporary injunction context, a trial court abuses its discretion if it misapplies the law to established facts or if the evidence does not reasonably support the trial court's determination that the

---

[4] Though appellants requested findings of fact and conclusions of law, none were issued. Trial in the underlying case is currently set for July 25, 2022.

applicant satisfied the requisite elements. *See RWI Constr.*, 583 S.W.3d at 274–75. Our abuse-of-discretion review requires that we "view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor," and defer to the trial court's resolution of conflicting evidence. *Amend v. Watson*, 333 S.W.3d 625, 627 (Tex. App.—Dallas 2009, no pet.). When, as here, no findings of fact or conclusions of law are filed, the trial court's order must be upheld on any legal theory supported by the record. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

There are two general types of temporary injunctions: prohibitive and mandatory. *Retail Servs. WIS Corp. v. Crossmark, Inc.*, No. 05-20-00937-CV, 2021 WL 1747033, at *7 (Tex. App.—Dallas May 4, 2021, pet. denied) (mem. op.). A prohibitive injunction forbids conduct, while a mandatory injunction requires it. *Id.*

To obtain a temporary injunction, the applicant must plead and prove three elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. Additionally, a preliminary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *Retail Servs.*, 2021 WL 1747033, at *7; *Health Care Serv. Corp. v. E. Tex. Med. Ctr.*, 495 S.W.3d 333, 338 (Tex. App.—Tyler 2016, no pet.) (citing *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981)).

The probable right to relief element requires the applicant to present enough evidence to raise a bona fide issue as to its right to ultimate relief. *Young Gi Kim v. Ick Soo Oh*, No. 05-19-00947-CV, 2020 WL 2315854, at *2 (Tex. App.—Dallas May 11, 2020, no pet.) (mem. op.). This requires the applicant to produce some evidence supporting every element of at least one valid legal theory. *Id*.

"An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by a certain pecuniary standard." *RWI Constr.*, 583 S.W.3d at 275 (citing *Butnaru*, 84 S.W.3d at 204). "Establishing probable, imminent, and irreparable injury requires proof of an actual threatened injury, as opposed to a speculative or purely conjectural one." *Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 908 (Tex. App.—Austin 2009, no pet.). "In other words, before an injunction issues there must be evidence that injury is threatened." *Dallas Gen. Drivers, Warehousemen & Helpers v. Wamix, Inc.*, 295 S.W.2d 873, 879 (Tex. 1956).

## Analysis

Appellants state their appellate issues as follows:

> Whether the trial court erred in granting [Argo's] Application for Temporary Injunction. This raises the following issues:
> 1. Was Argo—the issuer of the surety bonds at issue in this lawsuit—required to establish all the familiar elements required for injunctive relief under Texas law? Or does a "more lenient" standard apply to sureties as argued by Argo?
> 2. During the temporary injunction hearing, did Argo introduce sufficient evidence to establish each of the elements required for issuance of the requested injunctive relief?

3. Did the trial court abuse its discretion by issuing the Temporary Injunction?

In their arguments pertaining to those issues, appellants specifically contend Argo failed to establish an inadequate remedy at law and irreparable harm and did not satisfy the "heightened burden" for mandatory injunctive relief.

As to a "more lenient" standard, Argo responds that it did not ask the trial court to base its decision on such a standard. Argo asserts that though its trial court brief cited a federal case that apparently applied such a standard, its brief "continued on to (1) state that '[d]espite the more lenient standard given to sureties, [Argo] still meets the following three factors which traditionally govern injunctive relief,' and (2) walk through arguments and authority for each element of injunctive relief."

Despite appellants' assertions, the record does not show Argo requested or the trial court applied a standard other than the established Texas standard described above. *See Butnaru*, 84 S.W.3d at 204. We apply that standard here. *See id*.

Appellants do not address that standard's first and second elements: a cause of action against the defendants and a probable right to the relief sought. Argo's petition asserted causes of action against all four defendants for indemnification, specific performance, and breach of contract. The record shows (1) the indemnity agreement obligated appellants to "deposit with the Surety, upon demand, an amount of money or other collateral security acceptable to the Surety, as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made

any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses," including all costs and expenses incurred "in connection with investigating, paying or litigating any claim under the Bonds" or "in connection with enforcing the obligations of the Indemnitors under this Agreement including, but not limited to interest, legal fees and expenses"; (2) the State of North Dakota made claims on the bonds; (3) Argo has investigated and paid those claims; and (4) appellants do not dispute that they have provided no collateral or indemnification in response to Argo's requests. Thus, the first two elements are satisfied. *See Young Gi Kim*, 2020 WL 2315854, at *2.

Appellants contend Argo was also required to establish it "does not have an adequate remedy at law" and "will suffer irreparable harm without the requested injunctive relief." According to appellants, (1) Argo "has an adequate remedy at law (*i.e.*, a final monetary judgment)" because it "has already paid out all claims on the Bonds" and "[its] alleged 'loss' or 'liability' can therefore be measured by a 'certain pecuniary standard,'" and (2) as to irreparable harm, "Argo relied on nothing more than its speculative/unfounded fear that it may have 'uncollectible defendants,'" and "[s]uch speculative apprehension is not enough to show irreparable harm."[5]

---

[5] Though appellants assert additional contentions regarding adequate remedy and irreparable harm in their appellate reply brief for the first time, those contentions present nothing for this Court's review. *See, e.g.*, *Veterinary Specialists of N. Tex., PLLC v. King*, No. 05-21-00325-CV, 2022 WL 406095, at *6 (Tex. App.—Dallas Feb. 9, 2022, no pet. h.) (mem. op.) ("[W]e may not consider arguments raised for the first time in a reply brief.") (citing *Sanchez v. Martin*, 378 S.W.3d 581, 590 (Tex. App.—Dallas 2012, no pet.)).

The parties cite no Texas state court opinions addressing preliminary injunctive relief to a surety suing on an indemnity agreement, and we have found none. Both sides rely on cases from federal district courts, which are split as to the availability of such relief. *See Merchants Bonding Co. (Mutual) v. Ark. Constr. Sol., LLC*, No. 5:18-CV-05078, 2019 WL 452767, at *4–5 (W.D. Ark. Feb. 5, 2019) (discussing federal district courts' conflicting opinions regarding preliminary injunctive relief for sureties suing on indemnity agreements). As one federal district court has observed, "there are more district courts that come down squarely on the side of granting preliminary injunctive relief in indemnity agreement cases" than courts that reject the propriety of such relief. *Id*. at *4. Though we are not bound by those preponderating federal district court opinions, we find them persuasive.

*Merchants Bonding* involved a surety's request for preliminary injunctive relief in a lawsuit based on an indemnity agreement containing the same provisions as the agreement before us. The federal district court stated, "Defendants greatly minimize the harm to [the surety] when they argue that the purpose of a collateral security clause is only 'to provide sureties with access to financial cushioning during the pendency of claims,' such that any loss resulting from the failure to pay over collateral 'is monetary in character and may be adequately remedied by a judgment on the merits.'" *Id*. Though the court agreed with the defendants in that case that "in the ordinary case, a party's ability to be fully compensated through an award of

–14–

damages means that its harm is neither 'irreparable' nor equitable in nature," the court reasoned:

> The risk of loss to a surety who is a party to an indemnity agreement—as opposed to some other kind of agreement—is unique. This is because the indemnitor specifically promises to indemnify the surety from any future loss, even temporary loss, associated with a bond, through the payment of collateral upon demand. It follows that it would not make [the surety] whole to order Defendants to pay a money judgment at the end of this litigation.

*Id*. The court stated it was "persuaded by the notion that 'even if a surety's loss is monetary and only temporary, *that it must assume a primary obligor's obligation at all* is a harm for which there is no adequate remedy at law.'" *Id*. (quoting *Travelers Cas. & Sur. Co. v. Ockerlund*, No. 04 C 3963, 2004 WL 1794915, at *5 (N.D. Ill. Aug. 6, 2004)).

In *International Fidelity Insurance Co. v. Talbot Construction, Inc*., No. 1:15-CV-3969-LMM, 2016 WL 8814367, at *2 (N.D. Ga. Apr. 13, 2016), a surety that had paid out on a portion of claims under a virtually identical indemnity agreement and also anticipated additional future claims sought a preliminary injunction in its breach-of-contract lawsuit against the indemnitors. The indemnitors contended there was no lack of an adequate remedy because money damages would adequately compensate the surety for the claims it had paid out prior to suit and any future losses, as all such amounts were fixed and known. *Id*. at *6. The court disagreed and concluded the surety lacked an adequate remedy at law for protection against both actual and potential losses. *Id*. The court stated injunctive relief in such

circumstances "protect[s] three interests of the surety: the bargained-for benefit of collateral security, avoidance of present exposure to liability during pending litigation against indemnitors, and avoidance of risk that, should Indemnitors become insolvent, the surety will be left as a general unsecured creditor, frustrating the purpose of the indemnity agreement." *Id*. at *7. The court reasoned:

> Damages available after trial and judgment, even if including costs and interest, are of little use to [the surety] when it is responsible for investigating, defending, and paying claims on bonds in the present— claims arising due to [the indemnitor's] alleged failure to fulfill its obligations. Protection against this risk to [the surety] is precisely what the collateral security provision was meant to secure, and no amount of future damages provides an adequate remedy to harm resulting from present exposure.

*Id*. at *7. The court stated that "[t]his is as true for losses [the surety] has already paid as for losses [the surety] expects in the future," as "[h]ad Indemnitors fulfilled their promises under the Agreement to pay [the surety's] collateral security demand when it was first made, [the surety] never would have had to use its own funds to pay actual losses in the first place." *Id*. at *8 (citing *Kearney Constr. Co., LLC v. Travelers Cas. & Sur. Co. of Am.*, No. 8:09-cv-1850-T-30TBM, 2010 WL 2803971, at *3 (M.D. Fla. July 15, 2010) (surety "is without an adequate remedy at law to the extent that if equitable relief [were] not granted, it would be forced to continue to use its own funds in defense of the claims against the Indemnitors")); *see also Ockerlund*, 2004 WL 1794915, at *6 (granting preliminary injunctive relief to surety that had already paid some bond claims at issue and stating, "The cases and the

Restatement make clear that, for a surety in this situation, it is not simply an issue of a monetary loss; rather, it is an issue of impairing a surety's expectation and requiring it to suffer any loss, even if only temporary, associated with the performance of a primary obligor's duty.").

Here, Argo contends (1) the indemnitors "agreed not only to indemnify the Surety for any liability under the bonds, but also to provide on demand collateral sufficient to mitigate the burden, delay, and collection-risk of enforcing the indemnification right through a final judgment," and (2) "[t]he burdens and risks suffered due to lack of collateral and timely indemnification would not be reflected in a monetary judgment that merely awards the amount that the Surety paid on the bonds, which is the flawed 'certain pecuniary standard' that the Indemnitors propose." We agree.

Like in the federal district court cases described above, the indemnity agreement here obligated appellants to deposit "an amount of money or other collateral security" with the Surety upon demand, "whether or not the Surety shall have made any payment therefor, equivalent to such amount that the Surety, in its sole judgment, shall deem sufficient to discharge any Losses or to protect it from any potential or anticipated Losses," including all costs and expenses incurred in connection with the bonds and with enforcing the indemnitors' obligations. Argo has investigated and paid claims of more than $3 million and continues to bear the burden of being deprived of those funds, while also having to use its own additional

funds in this litigation. Thus, its losses are ongoing and continue to accrue. Based on the reasoning in the above-described federal district court opinions, we conclude the record shows Argo lacks an adequate remedy at law as to its claims. *See Merchants Bonding*, 2019 WL 452767, at *4–5; *Talbot Constr.*, 2016 WL 8814367, at *2; *Ockerlund*, 2004 WL 1794915, at *6.

As to irreparable harm, appellants contend in their appellate brief that "Argo wants this Court to improperly conflate the separate elements of inadequate remedy at law and irreparable harm." We disagree with appellants' characterization of Argo's argument. As described above, under Texas law, "[a]n injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by a certain pecuniary standard." *RWI Constr.*, 583 S.W.3d at 275. Thus, to the extent Argo addresses these "elements" together, that is not necessarily improper. *Id*.

Further, Argo does not merely treat these two considerations as one, but instead specifically describes its evidence pertaining to the indemnitors' dissipation of assets as "evidence of irreparable harm." This evidence includes the following: (1) Mr. Lavitt testified he sent appellants the September 9, 2020 demand letter because appellants "had failed to pay premium on the anniversary date of the bonds, and there was concern also about a declining financial condition, deteriorating material financial condition"; (2) when Argo received no response, Argo's outside counsel sent the October 21, 2020 demand letter, but none of the indemnitors

responded; (3) Mr. Brothen sent Mr. Goggans a March 2, 2021 letter by certified mail requesting a meeting as soon as possible regarding claims Argo had received and informing him that his cooperation "is urgently needed to save both Argo and you (as an indemnitor) money," but that letter "came back unmarked, unclaimed"; (4) Argo hired a private investigator who "camp[ed] out in front of Mr. Goggans' gated community" and "attempted to deliver [the March 2, 2021 letter] to a woman who he believed to be Mrs. Goggans," but "she refused to accept it"; (5) the State of North Dakota made three claims on the bonds, which Argo investigated and paid; (6) under the indemnity agreement, Argo is entitled to all of its losses incurred in connection with the bonds and related litigation; (7) the indemnitors have not provided any collateral or indemnification to Argo; (8) on March 22, 2021, 31 Group LLC entered into an agreement to sell certain oil and gas properties in North Dakota to Empire; (9) that transaction closed on May 7, 2021, with the purchase price "payable one year from the closing date"; and (10) Argo is "aware" of a listing of "certain assets of 31, not located in North Dakota," that "are up for sale."

Argo argues this evidence demonstrated irreparable injury because it showed that the indemnitors seek to "obstruct[] the use of their assets" through dissipation and thus subject Argo to increased "burden and risk" in collecting a monetary judgment as a general unsecured creditor. Argo asserts it "established such obstruction" by "showing that the Indemnitors intended to transfer their assets and were refusing to honor not only the indemnification agreement but also other

–19–

financial obligations," including bond premiums and their bonded obligations to the State of North Dakota.

Appellants contend this evidence does not show Argo's alleged harm is irreparable because Argo "failed to introduce any actual evidence that Appellants are dissipating assets" and introduced no evidence "showing Argo may not be able to collect from Appellants if Argo ultimately obtains a monetary judgment in this litigation." According to appellants, Argo's evidence shows only "fear and apprehension" of irreparable injury, rather than an "existing actual threat" to Argo's rights.

We disagree with appellants. Viewed in the light most favorable to the trial court's order, the evidence that appellants are selling assets and evading financial obligations supports a reasonable inference of a deteriorating financial condition that would affect appellants' ability to fully satisfy a money judgment based on Argo's losses, which continue to increase. *See Hartford Fire Ins. Co. v. 3i Constr., LLC*, No. 3:16-CV-00992-M, 2017 WL 3209522, at *4 (N.D. Tex. May 18, 2017) (concluding "[the surety's] concern that it will suffer irreparable harm because the Indemnitors did not respond to the demand letter or pay its subcontractors is not speculative; it supports a conclusion that the Indemnitors are disposing of assets or lack the ability to pay a judgment if one is entered against them"). Thus, the record contains some evidence of a threatened injury. *Id*. We conclude the trial court did not abuse its discretion by determining Argo demonstrated irreparable injury. *See Graham Mortg.*

*Corp. v. Hall*, 307 S.W.3d 472, 477–78 (Tex. App.—Dallas 2010, no pet.) ("If some evidence reasonably supports the trial court's decision, the trial court does not abuse its discretion.").

Having rejected appellants' position that Argo failed to satisfy the elements for prohibitive injunctive relief, we next turn to appellants' contention that, "at minimum," the portion of the trial court's order requiring appellants to deposit collateral into the trial court's registry should be dissolved because the record shows Argo "presented no evidence of any hardship or necessity" to support that provision and thus did not meet the "heightened burden" applicable to mandatory injunctive relief.

Argo responds that "[c]ourts uphold mandatory injunctions to provide collateral if there is 'some evidence supporting the inclusion of this provision in the temporary injunction,'" quoting *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 768 (Tex. App.—Texarkana 2017, pet. dism'd).

As described above, under Texas law, a preliminary mandatory injunction is proper only if a mandatory order is necessary to prevent irreparable injury or extreme hardship. *Retail Servs.*, 2021 WL 1747033, at *7. Argo cites no Texas authority, and we have found none, that supports disregarding this standard here.

*Hartwell* stems from a line of cases holding that "a mandatory provision in a prohibitive injunction" need not meet the mandatory injunctive relief standard if it is "incidental" to the prohibitive injunctive relief granted. *See Hartwell*, 528 S.W.3d

–21–

at 768 (citing *Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 592–93 (Tex. App.—El Paso 2003, pet. denied) (affirming injunctive relief provision without showing of necessity or extreme hardship where required action on Tri-Star's part— relinquishing operations and ceasing to act as operator of project—was "incidental" to injunction's prohibitive relief provision prohibiting Tri-Star from interfering with successor operator's assumption of control)). Argo did not address or explain in the trial court, and does not address or explain on appeal, how the requirement that appellants deposit collateral into the trial court's registry until final adjudication on the merits is part of a prohibitive injunction or incidental to its requested prohibitive relief. *See Tex. Health Huguley, Inc. v. Jones*, No. 02-21-00364-CV, 2021 WL 5405794, at *7 (Tex. App.—Fort Worth Nov. 18, 2021, no pet.) (temporary injunction burden "rests squarely on the shoulders of the party seeking judicial intervention").

Nor does Argo describe how the record demonstrates the "necessary to prevent irreparable injury or extreme hardship" requirement as to the mandatory injunctive provision in question. *See Veterinary Specialists of N. Tex., PLLC v. King*, No. 05-21-00325-CV, 2022 WL 406095, at *4 (Tex. App.—Dallas Feb. 9, 2022, no pet. h.) (mem. op.) (stating "applicant must show" mandatory injunctive relief standard is met). On this record, we conclude Argo did not satisfy its burden as to the mandatory injunctive relief provision requiring appellants to deposit collateral

into the trial court's registry until a final adjudication on the merits. Thus, the trial court abused its discretion by providing that mandatory injunctive relief.[6]

In appellants' remaining issue, they contend, "The Temporary Injunction is also inappropriate under prior decisions from this Court prohibiting the freezing of assets to ensure payment of a judgment that may be obtained in the future—which is exactly what occurred here." (citing *RWI Constr.*, 583 S.W.3d at 269). According to appellants, the temporary injunction's provision enjoining appellants from "transferring, encumbering, or otherwise dissipating *any* of their assets" violates this "ancient and controlling rule," and reversal of the temporary injunction is thus required.

*RWI Construction* involved a lender suing a defaulting borrower on a loan secured by collateral, including the borrower's accounts receivable, inventory, and other personal property. *Id*. at 272. Thus, that case is distinguishable because the unique considerations described above regarding indemnity agreements were not applicable. *See id*.

Moreover, this Court stated in *RWI Construction* that the general rule "foreclos[ing] resort to injunctive relief simply to sequester a source of funds to satisfy a future judgment" does not control "where there is a logical and justifiable connection between the claims alleged and the acts sought to be enjoined, or where

---

[6] We make no conclusion in this opinion that would preclude Argo from obtaining the mandatory injunctive relief in question on a proper showing of the requirements.

the plaintiff claims a specific contractual or equitable interest in the assets it seeks to freeze." *Id*. at 277. Here, instead of requiring appellants to grant an up-front security interest, Argo bargained for appellants' assets to be used for Argo's benefit under the indemnity agreement's terms, which included specific performance of the collateral-upon-demand requirement in an amount determined by Argo's "sole judgment." Though Argo has paid claims of more than $3 million and continues to accrue additional losses, appellants have not provided any of the demanded collateral. Thus, the exception described in *RWI Construction* is applicable here as to Argo's still-growing interest in appellants' assets—some of which have already been sold. *See id*. We disagree with appellants' position that *RWI Construction* requires reversal of the temporary injunction in this case.

\* \* \*

We reverse the portion of the trial court's temporary injunction order requiring appellants "to deposit or direct $3,630,500.00 as collateral to the [trial court's] registry, or otherwise [sic] agreed by the Parties, to be held until a final adjudication on the merits." We affirm the temporary injunction order in all other respects.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

31 HOLDINGS I, LLC; 31
OPERATING, LLC; 31 GROUP,
LLC; AND KENNETH GOGGANS,
Appellants

No. 05-21-00546-CV          V.

ARGONAUT INSURANCE
COMPANY, Appellee

On Appeal from the 439th Judicial
District Court, Rockwall County,
Texas
Trial Court Cause No. 1-21-0634.
Opinion delivered by Justice Carlyle.
Justices Reichek and Nowell
participating.

In accordance with this Court's opinion of this date, the trial court's temporary injunction order is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** the portion of the trial court's temporary injunction order requiring appellants 31 HOLDINGS I, LLC; 31 OPERATING, LLC; 31 GROUP, LLC; and KENNETH GOGGANS "to deposit or direct $3,630,500.00 as collateral to the [trial court's] registry, or otherwise [sic] agreed by the Parties, to be held until a final adjudication on the merits." In all other respects, the trial court's temporary injunction order is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 17th day of February, 2022.